**David KAVICH and Edythe T. Kavich,\* Plaintiffs,**

v.

**UNITED STATES of America, Defendant.**

**Civ. No. 79–0–86.**

United States District Court, D. Nebraska.

Feb. 13, 1981.

Truman Clare and Steven M. Watson, Omaha, Neb., for plaintiffs.

Ludwig H. Adams, Tax Division, U. S. Dept. of Justice, Washington, D. C., for defendant.

\* Edythe T. Kavich is a named plaintiff only because she filed joint income tax returns with her husband, David Kavich. Therefore, in the

Memorandum Mr. Kavich may be referred to as "*the* plaintiff."

## MEMORANDUM

DENNEY, District Judge.

This is a tax refund case which was tried to the Court on October 7 and 8, 1980. Subsequent to trial, the parties submitted final written arguments. The following discussion constitutes the Court's findings of fact and conclusions of law.

### I. *Background and Uncontroverted Facts*

At their pretrial conference, the parties stipulated to the following facts:

1. That the Plaintiffs are husband and wife, citizens and residents of the state of Nebraska, residing in Fremont, Nebraska, and at all times pertinent hereto were residents of the state of Nebraska.

2. That said Plaintiffs filed a joint federal income tax return for the calendar year 1969 within the time required by law, April 15, 1970, and paid taxes as disclosed by said return in the amount of $7,813.00.

Subsequent thereto, the Defendant, for said taxable year 1969, collected additional taxes in the amount of $7,754.00, which taxes were paid by the Plaintiffs on or about July 21, 1976.

That within the time required by law the taxpayers filed with the Defendant their claim for refund in the amount of $7,754.00, and that on August 31, 1977, the Defendant disallowed this claim. That more than six (6) months have elapsed since the date of the filing of said claim for refund before this complaint was filed.

3. That the Plaintiffs filed a joint federal income tax return for the calendar year 1970 by April 15, 1971, and paid taxes with said return in the amount of $11,936.00. That subsequent thereto the Defendant collected additional taxes in the amount of $7,262.00, which taxes were paid by the Plaintiffs on or about July 21, 1976. That within the time required by law, the taxpayers filed with the Defendant their claim for refund for $7,850.00, which claim was disallowed by the Defendant on or about August 31, 1977.

4. That the Plaintiffs filed a joint federal income tax return for the calendar year 1971 by April 15, 1972, and paid taxes with said return in the amount of $1,139.00. That thereafter the Defendant assessed additional taxes for the year 1971 in the amount of $1,506.87, which taxes were paid by the Plaintiffs on or about July 21, 1976. That thereafter and within the time required by law, the Plaintiffs filed with the Defendant their claim for refund in the amount of $1,504.00, which claim for refund the Defendant disallowed on or about August 31, 1977.

5. That the Plaintiffs filed a joint federal income tax return for the calendar year 1972, by April 15, 1973, and paid taxes with said return in the amount of $4,430.00. That subsequent thereto the Defendant, for the taxable year 1972, collected additional taxes in the amount of $1,528.00, which taxes were paid by the Plaintiffs to the Defendant on or about July 21, 1976. That thereafter and within the time required by law, the Plaintiffs filed with the Defendant a claim for refund in the amount of $5,910.00. That on or about August 31, 1977, Defendant disallowed said claim.

6. That in 1971, the Plaintiffs paid a total of $1,018.41 to Kutak Rock & Campbell in connection with legal fees respecting guarantees by David Kavich with the United States National Bank of Omaha. That in addition thereto the Plaintiffs paid to John P. Maguire & Company during 1971 at least the sum of $4,965.95.

7. That the Plaintiffs paid to Ephraim L. Marks, attorney at law, during 1972, the sum of $2,000.00 in connection with the guarantee of David Kavich with the United States National Bank of Omaha; and the Plaintiffs paid John Kerrigan, attorney at law, during 1972, the sum of $151, in connection with the guarantee by David Kavich with the United States National Bank of Omaha. That the Plaintiffs paid the Kutak Rock law firm in 1972, the sum of $111.20, in connection with the guarantee of the Plaintiff David Kavich with the United States National

Bank of Omaha. That the Plaintiffs paid payroll taxes in 1972 of the National Carpet, Inc. in the amount of $1,106.00. That the Plaintiffs paid the sum of $2,565.00 in 1972 to the First National Bank of Fremont in connection with National Carpets, Inc.

8. David Kavich was a shareholder, officer and director of National Carpets, Inc., a corporation formed in 1957 to engage in the sale of carpeting. The other shareholders, officers and directors of National Carpets were Paul Rosen and Robert Rosen.

9. David Kavich's salary from National Carpets was approximately $4,280.00 annually until the salary was terminated on August 1, 1970. *David Kavich's primary source of income is and was the Kavich Furniture store which he operates in Fremont, Nebraska.*

10. David Kavich's initial investment in National Carpets was at least $3,500.00.

11. At the time he guaranteed the debts of National Carpets, Inc., David Kavich was the owner of one-third of the outstanding shares of National Carpets, Inc.

12. According to the financial reports in the following fiscal years of National Carpets, its gross income, taxable income, capital stock and accumulated earnings were as follows:

| Fiscal Year Ending | Gross Income | Net Income |
| --- | --- | --- |
| 6/30/60 | $380,447.88 | $10,087.01 |
| 6/30/61 | 497,518.70 | 14,636.82 |
| 6/30/62 | 686,266.10 | 23,410.62 |
| 6/30/63 | 808,323.96 | 31,335.75 |
| 6/30/64 | 846,538.43 | |
| 6/30/67 | 1,191,970.00 | 15,683.00 |
| 6/30/68 | 1,172,550.00 | (16,938.00) |
| 6/30/69 | 1,493,599.00 | (177,862.00) |
| 6/30/70 | 1,532,654.00 | (155,388.00) |

| Fiscal Year Ending | Capital Stock | Accumulated Earnings |
| --- | --- | --- |
| 6/30/60 | $4,000.00 | ($18,809.46) |
| 6/30/61 | 4,000.00 | ( 5,404.32) |
| 6/30/62 | 6,000.00 | 18,327.27 |
| 6/30/63 | 6,000.00 | 48,472.41 |
| 6/30/64 | 6,000.00 | 57,855.60 |
| 6/30/67 | 6,000.00 | 62,785.00 |
| 6/30/68 | 6,000.00 | 43,074.00 |
| 6/30/69 | 6,000.00 | (139,372.00) |
| 6/30/70 | 36,000.00 | (296,473.00) |

13. In 1963, Kavich Furniture loaned to National Carpets the sum of $20,000.00 with specific terms for repayment.

14. In 1964, David Kavich guaranteed the payment of debts of National Carpets to Coronet Industries, a carpet supplier, to a limit of $36,600.00.

15. In 1966, David Kavich guaranteed the payment of debts of National Carpets to the United States National Bank of Omaha to a limit of $50,000.00.

16. On October 3, 1967, and again on March 26, 1969, David Kavich guaranteed the payment of debts of National Carpets to John P. Maguire & Co., a distributor of carpeting, with no limitation on amount.

17. On May 1, 1969, David Kavich guaranteed the payment of debts of National Carpets to J.P. Stevens & Co., a carpet supplier, with no limitation on amount.

18. On February 28, 1971, the United States National Bank of Omaha called the guarantees due immediately and seized the remaining inventory of the National Carpets store at 72nd & Dodge Streets and padlocked the door of the store, putting National Carpets out of business.

[Filing # 17, pp. 1–4] (emphasis added).

II. *Issues Presented*

In addition to having done a fine job of setting forth the pertinent facts of this case, the attorneys successfully narrowed the legal issues. The pretrial order indicates that the only matters remaining to be determined by the Court are:

1. Whether each or any of the following amounts allegedly paid by David Kavich gave rise to bona fide debts:

(a) $5,515.95 to John P. Maguire pursuant to a guarantee by Kavich of the debts of National Carpets in 1971.

(b) $1,018.41 as attorney fees in defense of a lawsuit with the United States National Bank of Omaha regarding a guarantee by Kavich of the debts of National Carpets in 1971.

(c) $45,000.00 to J.P. Stevens Company, Inc. pursuant to a guarantee by Kavich of the debts of National Carpets in 1972.

(d) $30,000.00 to Coronet Industries Inc. pursuant to a guarantee by Kavich of the debts of National Carpets in 1972.

(e) $2,000.00 to Ephraim Marks, attorney at law, in 1972.

(f) $151.00 to John Kerrigan, attorney at law, in 1972.

(g) $111.00 to the law firm of Kutak Rock in 1972.

(h) $1,106.00 to the Internal Revenue Service for payroll taxes owed by National Carpets in 1972.

(i) $2,565.00 to the First National Bank of Fremont in connection with a debt of National Carpets in 1972.

2. Whether each or any of the above amounts are deductible by Plaintiffs as business bad debts.

[Filing # 17, pp. 4–5].

## III. *The Bona Fide Debt Requirement*

Section 166 of the Internal Revenue Code (26 U.S.C. § 166) allows a deduction for any debt which becomes worthless during the taxable year.[1] The statute distinguishes between business bad debts and nonbusiness bad debts. The threshold question, however, in determining the validity of *any* bad debt deduction, business or nonbusiness, is whether the amounts advanced or guaranteed[2] gave rise to bona fide debts. The regulations provide:

> Only a bona fide debt qualifies for purposes of section 166. A bona fide debt is a debt which arises from a debtor-creditor relationship based upon a valid and enforceable obligation to pay a fixed or determinable sum of money.

Treas.Reg. § 1.166–1(c) (1969).

Several factors may be considered in determining whether a given advance or guarantee is more in the nature of debt than of equity investment. In *United States v. Uneco, Inc. (In the Matter of Uneco, Inc.)*, 532 F.2d 1204 (8th Cir. 1976), the Eighth Circuit discussed these factors. The court stated:

> In *J. S. Biritz Construction Co. v. Commissioner of Internal Revenue* [387 F.2d

---

1. In pertinent part, the statute provides:
   (a) General rule.
   (1) Wholly worthless debts. There shall be allowed as a deduction any debt which becomes worthless within the taxable year.
   (2) Partially worthless debts. When satisfied that a debt is recoverable only in part, the Secretary or his delegate may allow such debt, in an amount not in excess of the part charged off within the taxable year, as a deduction.
   \* \* \* \* \* \*
   (d) Nonbusiness debts.
   (1) General rule. In the case of a taxpayer other than a corporation—
   (A) subsections (a) and (c) shall not apply to any nonbusiness debt; and
   (B) where any nonbusiness debt becomes worthless within the taxable year, the loss resulting therefrom shall be considered a loss from the sale or exchange, during the taxable year, of a capital asset held for not more than 1 year.
   (2) Nonbusiness debt defined. For purposes of paragraph (1), the term "nonbusiness debt" means a debt other than—
   (A) a debt created or acquired (as the case may be) in connection with a trade or business of the taxpayer; or
   (B) a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business.
   I.R.C. § 166.

2. For purposes of I.R.C. § 166, guaranteed debts are treated as if the guarantor advanced to the principal obligor the amount covered by the guarantee. This is because "[t]here is no real or economic difference between the loss of an investment made in the form of a direct loan to a corporation and one made indirectly in the form of a guaranteed ... loan." *Putnam v. Commissioner*, 352 U.S. 82, 92–93, 77 S.Ct. 175, 179–80, 1 L.Ed.2d 144 (1956). It appears from his brief that the plaintiff reads more into *Putnam* than is warranted. Plaintiff seems to contend that *Putnam* stands for the proposition that, as a matter of law, any guarantee which a taxpayer is required to honor gives rise to a § 166 deduction [Plaintiff's Final Argument at 4 and Plaintiff's Reply to Defendant's Final Argument at 2]. In the Court's opinion, *Putnam* only says that loans and guarantees should be treated alike. Thus, it would be anomalous to then say that payments made pursuant to guarantees are *not* subject to the bona fide debt requirement. In sum, the plaintiff's argument is invalid. *See Casco Bank & Trust Co. v. United States*, 544 F.2d 528, 533–34 (1st Cir. 1976), *cert. denied* 430 U.S. 907, 97 S.Ct. 1176, 51 L.Ed.2d 582 (1977).

451, 456–57 (8th Cir. 1967)], we recognized that each case turns upon its particular facts and that the varying indicia applied in determining the issue may or may not have relevancy to a particular case. Ten different indicia were identified in *Biritz* and may be summarized as follows:

(1) Whether the corporation was so grossly undercapitalized that the loans were in fact needed for capital purposes and were actually intended to be risked capital rather than a loan.

(2) Whether the purported loans were made in proportion to equity holdings.

(3) Whether the repayment of the loan was predicated on the success of the venture.

(4) Whether there was a fixed date for payment of the note and a reasonable expectation of payment by that date.

(5) Whether the note was subordinated to other corporate debts.

(6) Whether third parties would have made the loan under the same conditions.

(7) Whether the claimed loan was secured by a mortgage or otherwise.

(8) Whether a provision was made for a sinking fund to retire the loan.

(9) Whether the person making the purported loan participated in the management of the corporation.

(10) Whether the corporation had a large proportion of debt to equity.

\*     \*     \*     \*     \*     \*

The indicia supplied by *Biritz* are objective tests which, with the possible exception of the first indicia, require no reference to a subjective state of mind.

*Id.* at 1207–08. While certainly not as helpful due to absence of explanatory regulations, other relevant factors are set out in I.R.C. § 385.

In *Uneco*, the Eighth Circuit was confronted with a purported loan as opposed to a purported guarantee. Nonetheless, in regard to the debt versus equity analysis, the same considerations generally are relevant.

*Casco Bank & Trust Co. v. United States,* 544 F.2d 528, 534–535 (1st Cir. 1976), *cert. denied,* 430 U.S. 907, 97 S.Ct. 1176, 51 L.Ed.2d 582 (1977). Of course, because of the differences between a loan and a guarantee, some of the *Uneco* considerations may not be entirely applicable to the case at bar.

### IV. *The Guarantees—Findings of Fact Regarding Debt Versus Equity*

While the payments made by the plaintiffs fall into several separate categories, at the very heart of this case is the proper treatment of the large guarantee payments. Therefore, the first and most important task involves application of the *Uneco* standards to the guarantees that plaintiff extended for the benefit of National Carpets, Inc. This analysis will determine whether the guarantee payments were related to bona fide debts as defined in the Secretary's Regulations.

Under *Uneco*, the first consideration is whether National Carpets, Inc. was so "grossly" undercapitalized that the guarantees were in fact needed for capital purposes. The guarantees given to John P. McGuire & Co., Inc. [Exs. # 7 and # 9], Coronet Industries, Inc. [Ex. # 8] and J.P. Stevens & Co., Inc. [Ex. # 10], were used to finance the inventory purchases of National Carpets, Inc. In contrast, the loan guarantee given to the United States National Bank of Omaha [Ex. # 6] was related to "store improvement" and "the whole financial structure of National Carpets" [Tr. 117:4 to 118:5]. The payments that David Kavich made on the three carpet manufacturer guarantees were much larger than those related to the Omaha bank guarantee. Therefore, the Court cannot say that the guarantees were needed for permanent capital purposes.[3]

The next factor to consider is whether the guarantees were made in proportion to the plaintiff's equity holdings in National Carpets, Inc. There was testimony that Mr.

---

**3.** It should be noted that this, however, is not entirely determinative of whether National Carpets, Inc. was in fact undercapitalized. That separate question will be discussed later in this Memorandum.

Kavich and the other two ⅓ shareholders of National Carpets, Inc. had executed earlier guarantees to the Omaha bank in proportion to their stock holdings [Tr. 139:21 to 140:7]. But, on *all* of the guarantees at issue in this case, David Kavich was the only shareholder who was required to give his signature. The guarantees thus were not made in proportion to equity holdings.

The third *Uneco* consideration is whether Mr. Kavich's release from liability was predicated on the success of National Carpets, Inc. By the very nature of the guarantees, it is obvious that Mr. Kavich was operating on the premise that National Carpets, Inc. would remain solvent. That is, if it stayed in business, he would never be called upon to pay on the guarantees.

In regard to whether there were fixed termination dates on the guarantees and a reasonable expectation of release by that date, it is clear that *no* such dates were stipulated [Tr. 122:25 to 123:5]. All of the guarantees stated that they were continuing until written notice by Mr. Kavich indicating his refusal to be bound by subsequent future advances.

The next pertinent factor to consider is whether a disinterested third party would have extended guarantees in favor of National Carpets, Inc. on the same basis as accepted by Mr. Kavich. No direct evidence was presented on this point. Still, the defendant correctly suggests that the Court examine the underlying circumstances of the various guarantees. Aside from his financial stake in the continued success of National Carpets, Inc. in Omaha and Kavich Furniture Co., Inc., in Fremont, David Kavich did not receive any direct, monetary consideration for extending the guarantees. It hardly seems likely that a disinterested third party would have consented to such liberal terms.

The *Uneco* case suggests consideration of whether Mr. Kavich had any form of security in these transactions. It is evident that he had none [Tr. 123:6–12]. He had no protection whatsoever when he exposed himself to liability.

Also relevant is whether there was any effort made to "retire" or reduce the outstanding amount of the guarantees. Aside from the $50,000.00 limit on the guarantee to the Omaha bank, apparently there was no substantial effort made to restrict the exposure on the guarantees or to eliminate them altogether at some future time.

Another pertinent factor is whether David Kavich participated in the management of National Carpets, Inc., which directly benefited from the guarantees. The record shows that, while the other two ⅓ shareholders of National Carpets, Inc. were more active in terms of day-to-day management, David Kavich was in fact the president as well as a director of the corporation.

In *Uneco*, the Eighth Circuit stated that it is important to examine corporate debt-equity ratios in order to ascertain adequacy of capitalization. Before examining the capitalization of National Carpets, Inc., it should be noted that there is no magic or perfect debt-equity ratio for any one given business. That is, it is only possible to determine whether a corporation's debt-equity ratio lies within a range of reasonable ratios for a particular industry or type of business. It was established at trial that the typical retail carpet business is not capital intensive. This is because most substantial expenditures are related to acquisition of inventory, and these purchases are usually financed on liberal terms by carpet suppliers [Tr. 159:13 to 160:7]. Therefore, the Court begins this mathematical analysis with the premise that a debt-equity ratio for a retail carpet business, while seemingly high in comparison to other kinds of businesses, might still be completely reasonable.

No evidence was presented as to reasonable or industry average debt-equity ratios for a retail carpet business similar to National Carpets, Inc. However, by way of corporate income tax returns and financial statements, the parties did provide the Court with enough data to compare the debt-equity ratios of Kavich Furniture Co., Inc., in Fremont, Nebraska, and National Carpets, Inc., in Omaha, Nebraska. For the five-year period 1966 to 1970, the ratios are as follows:

| Comparative Analysis of Debt-Equity Ratios | |
| --- | --- |
| National Carpets, Inc.[4] | Kavich Furniture Co., Inc.[5] |
| 1966: 7.0 | 3.0 |
| 1967: 5.2 | 2.3 |
| 1968: 7.2 | 2.0 |
| 1969: 108.8[6] | 2.3 |
| 1970: 16.5[7] | 2.4 |

Of course, the Court is not completely comfortable with the raw data set out above. But, even taking into account that the two corporations were somewhat different insofar as their marketing approach is concerned, one thing is quite obvious—the debt-equity ratio of National Carpets, Inc. was always at least twice as high as that of Kavich Furniture Co., Inc. The much higher debt-equity ratio of National Carpets, Inc. therefore does not appear "reasonable". Stated differently, the ratios suggest that the corporation was seriously undercapitalized at the time the plaintiff agreed to guarantee its debts.

There are also other indications that National Carpets, Inc. was undercapitalized. For example, in July, 1965, the plaintiff's accountant prepared a financial analysis of National Carpets, Inc. for the years 1960 through 1964 [Ex. # 84]. The accountant's report states that, at that time, "the capitalization is still low." *Id.* at p. 3 of cover letter. Also, in April, 1966, the plaintiff was told by a lending officer at the United States National Bank of Omaha that National Carpets, Inc. was undercapitalized [Tr. 128:8–13]. Finally, when asked at trial

why he was required to guarantee the inventory purchases of National Carpets, Inc., but not those of Kavich Furniture Co., Inc., the plaintiff admitted that the Omaha carpet store did not possess the financial and capital strength of the Fremont furniture store [Tr. 129:9–21].

The Eighth Circuit in *Uneco* stated that, along with the other factors examined above, it is proper to consider evidence of the parties' intent, although subjective intent clearly is not the controlling or dominant consideration. *United States v. Uneco, Inc. (In the Matter of Uneco, Inc.), supra,* 532 F.2d at 1208–09. The evidence of plaintiff's intent in this case is somewhat ambiguous. First, there is the fact that the guarantees on their face purport to be in the nature of debt as opposed to equity. But, the name put on the instruments must be viewed in light of the objective factors discussed before. The second indication of the plaintiff's intent is his own testimony at trial. In regard to the 1966 guarantee to the Omaha bank, Mr. Kavich was asked why the bank did not simply ask him and the other two ⅓ shareholders to put more capital into National Carpets, Inc. as opposed to having him execute a guarantee [Tr. 122:5–7]. Kavich admitted that the reason was that the Omaha bank felt that the other two shareholders were financially incapable of contributing more capital at that time [Tr. 122:7–11]. In light of this admission, it seems reasonable to infer that

**4.** The debt-equity ratios for National Carpets, Inc. were computed on the basis of figures appearing in its corporate federal income tax returns [Exs. # 122, # 123, # 124, and # 125]. The fiscal year for National Carpets, Inc. ended on June 30 during the pertinent 1966–70 period.

**5.** The debt-equity ratios for Kavich Furniture Co., Inc. were computed on the basis of figures appearing in unaudited financial statements prepared by the corporation's accountant, Boyd R. Hammond [Exs. # 112, # 113, # 114, # 115 and # 116]. The fiscal year for Kavich Furniture Co., Inc. ended on March 31 during the pertinent 1966–70 period.

**6.** This ratio was computed without regard to a net deficit in the corporation's equity holdings, i. e., in this year the deficit in the retained

earnings account exceeded the amount of paid in capital stock. An artificial, positive debt-equity ratio was achieved after dividing total liabilities by paid in capital stock, and ignoring the retained earnings deficit. Because of the retained earnings deficit, it might be argued that a meaningful debt-equity ratio simply cannot be computed. But, the method of calculation used here does in fact favor a "lower" debt-equity ratio because it assumes that the corporation had more equity than it actually did. Therefore, while the calculation method may not be theoretically correct, the taxpayer still receives the benefit of doubt. And, the Court feels that this artificial ratio is helpful in analyzing the severity of the corporation's undercapitalization.

**7.** *Id.*

it was Kavich's intent to use the guarantees as short term substitutes for infusion of more capital stock.

■ None of the factors discussed above are, standing alone, determinative of whether the large guarantees made by the plaintiff were more in the nature of debt than of equity. However, particularly in light of the thin capitalization of National Carpets, Inc. and the apparent intent of the plaintiff to use the guarantees as a substitute for putting more capital into the corporation, the Court concludes that the guarantees should be treated as equity advances, and not as bona fide debts. Having reached this conclusion on the threshold issue, the Court feels that the matter of business versus nonbusiness bad debt treatment is now moot.[8] That is, as explained before, business and nonbusiness bad debts alike must satisfy the initial requirement that they be bona fide.

---

**8.** In attempting to prove his right to § 166 deductions for business bad debts, the plaintiff articulates an appealing (though not convincing) argument. As pointed out in paragraph 9 of the stipulated pretrial facts set out above, Mr. Kavich's primary source of income was derived from his involvement with Kavich Furniture Co., Inc., in Fremont, Nebraska. It is apparent that Mr. Kavich's interest in starting National Carpets, Inc. was not simply to make profits from that corporation. That is, in addition to seeking a reasonable return on his investment in National Carpets, Inc. the plaintiff was most concerned with deriving various collateral benefits for Kavich Furniture Co., Inc. Plaintiff summarizes the indirect benefits accruing to the Fremont furniture store through operation of the Omaha carpet store as follows:

1. Backroom deals at the Chicago Mart were available for the first time. (T85, E48).
2. Freight discounts of $.40 to $.50 per yard were available. (T87–88, E49, 50).
3. Consolidated purchases for contract and rush jobs were available. (T89, E51).
4. Competitive muscle in joining forces in the struggle of the survival of the fittest in the "Black Hole of Calcutta" Omaha area market. (T90–93).
5. A confidential price list in the industry. (T93, E56).
6. Private labels to frustrate the lowest-price-available-shopper from comparing identical qualities in the stores. (T95, E58).

## V. Treatment of the Other Payments— Attorney's Fees, Payroll Taxes, and the Fremont Bank Loan Payment

In briefing this case, the defendant succeeded in artfully piercing plaintiff's thinly veiled arguments. Referring especially to the payments at issue separate from the large guarantees, the defendant asserts that the plaintiff has sought to establish that these payments may be deducted as bona fide debts because they were debts of the plaintiff at the time of payment. The defendant correctly asserts that this demonstrates a misunderstanding perception of I.R.C. § 166, which requires that there be a debt owing *to* the plaintiff, not that there be a debt owed *by* the plaintiff. In other words, to sustain the claimed deduction, there must be a showing of an enforceable obligation of National Carpets, Inc. to David Kavich which became worthless.

■ With this principle in mind, the defendant harpoons the claimed deductions

---

7. Free samples as mills were anxious to place their goods in the store. (T97, 100, E60, 67).
8. Assignment of accounts receivable from National Carpets which were a profitable item. (T97, 100, E61, 64, 65).
9. Carpet layer teams were available for larger rush jobs on the weekends. (T98, E62).
10. Advertising year-end credit in the carpet mills. (T101, E69).
11. Carpet padding purchases were $.75 per yard cheaper. (T109) and
12. Long term financing from Commercial Federal Savings & Loan Association was available for both carpet and furniture sales in the Fremont store. (T110–111).

[Plaintiff's Reply to Defendant's Final Argument at 3–4].

The Court is inclined to believe Mr. Kavich's claims that, at the time he paid off the debts of the Omaha carpet store, he was motivated by a desire to retain the good business reputation and credit rating of the Fremont furniture store. Under all of the circumstances of this case, his motivation at the time he honored the guarantees is insufficient to sustain the claimed § 166 deductions. This is because the critical issue is whether, at the times the various guarantees were extended, the plaintiff created a debtor-creditor relationship with National Carpets, Inc. In the Court's mind, the plaintiff's attorneys have failed to recognize this basic principle throughout the entire course of this lawsuit.

in regard to Kavich's attorney's fees in connection with the guarantees. The same fatal criticism is applicable to the claimed deduction in regard to Kavich's payment of National Carpets, Inc.'s delinquent payroll taxes.

Finally, the Court must deal with the plaintiff's 1972 payment of $2,565.00 to the First National Bank of Fremont. Plaintiff's payment satisfied an obligation of National Carpets, Inc. While no written document was ever put into evidence, it appears that the plaintiff had in some way guaranteed certain loans which the Fremont bank had extended to National Carpets, Inc. The defendant is willing to concede the existence of a guarantee arrangement. Because of this concession, however, the guarantee to the Fremont bank must be viewed in the same light as the guarantees to the Omaha Bank and the carpet manufacturers, i. e., the plaintiff's payment on the guarantee fails to give rise to a § 166 deduction.

## VI. *Conclusion*

The plaintiff has failed to establish that he is entitled to the claimed deductions. Therefore, no refund of taxes is warranted.

An order shall issue contemporaneously herewith, dismissing plaintiff's complaint.