HATCHETT, Circuit Judge:
 

 In this tax refund case, we decide that advances from a shareholder-taxpayer to several corporations did not constitute
 
 *1313
 
 debt, deductible under 26 U.S.C.A. § 166 (West 1978). We affirm.
 

 Background
 

 James A. Lane, the taxpayer, is involved in the real estate business. In 1961, Lane acquired the Parliament House property in Birmingham, Alabama, and operated it as a hotel until March, 1972. In 1972, Lane sold the hotel netting approximately $1 million. Due to this large amount of income, Lane paid taxes of over $321,000.
 

 Following sale of the Parliament House, Lane became involved in several other hotel operations. The three hotels relevant to this ease are (1) The Campus Inn, at Auburn, Alabama, (2) The Southern Peabody, in Memphis, Tennessee, and (3) The Russell Erskine, in Huntsville, Alabama. Lane established these hotels as Subchapter S corporations with himself as controlling stockholder. Although Lane’s percentage interest in several of the hotels decreased somewhat, he at all times retained over 40% stock interest in each of the three hotels.
 

 The three hotels were not successful business ventures. To satisfy the hotels’ need for funds, Lane advanced several hundred thousand dollars to the corporations and obtained funds from several institutional lenders, personally guarantying these institutional loans.
 

 In 1975, when the three corporations failed, Lane’s direct advances to the corporations had not been repaid. In addition, Lane incurred further losses when he was required to satisfy, as guarantor, the corporate obligations to the institutional lenders. In 1975, Lane filed an individual bankruptcy proceeding in the United States Bankruptcy Court, Northern District of Alabama, Southern Division. In 1979, Lane filed an amended income tax return for the year 1975 and claimed that he was entitled to bad debt deductions because of the money owed to him from the failed corporations. Lane sought to have these deductions against income carried back to 1972, thus, entitling him to a refund of $321,573 plus interest and costs for federal income taxes paid in 1972.
 

 Following the denial by the Internal Revenue Service of Lane’s claims, Frances B. Lane, the wife of James A. Lane, and James M. Gaines, as trustees of the bankrupt estate of James A. Lane, filed an adversary proceeding in United States Bankruptcy Court on September 2, 1980, for the refund of taxes allegedly illegally, erroneously, and excessively collected. This action was subsequently transferred from the Bankruptcy Court to the United States District Court for the Northern District of Alabama, Southern Division. The only issue before the district court was whether the amounts giving rise to the claim of a deduction constituted debt or equity. As the district court stated, “If the court determines that the amounts represent debt, the defendant has agreed to stipulate that the amounts represent business debts and that the claims for refund were timely filed and are due to be granted.”
 

 The district court held that the amounts advanced to, or on behalf of, the corporations did not constitute debt, but were equity in the corporations, and were not deductible. Without the bad debt deduction, plaintiffs, Frances B. Lane and James A. Gaines, the trustees of the bankrupt estate of James A. Lane, were not entitled to the claimed refund of $321,573 for taxes paid in 1972.
 

 Discussion
 

 The issue of whether advances made by a shareholder to a corporation constitute debt or equity is one faced by the courts many times. A taxpayer is entitled to take as a deduction any debt which becomes worthless in that taxable year. 26 U.S.C.A. § 166(a)(1).
 
 [1]
 
 The regulations
 
 *1314
 
 clearly state that a contribution to capital cannot be considered a debt for purposes of section 166. 26 C.F.R. § 1.166-l(c) (1983).
 
 [2]
 
 “The question of whether the advances from [Lane to the three corporations] constitute a loan or a contribution to capital depends on whether the advances are debt (loans) or equity (contributions to capital).”
 
 Stinnett’s Pontiac Service, Inc. v. C.I.R.,
 
 730 F.2d 634, 638 (11th Cir.1984).
 

 The Fifth Circuit in
 
 Slappey Drive Ind. Park v. United States,
 
 561 F.2d 572 (5th Cir.1977), sought to clarify the differences between debt and equity. “Articulating the essential difference between the two types of arrangement that Congress treated so differently is no easy task. Generally, shareholders place their money ‘at the risk of the business’ while lenders seek a more reliable return.”
 
 Slappey,
 
 561 F.2d at 581. In order for an advance of funds to be considered a debt rather than equity, the courts have stressed that a reasonable expectation of repayment must exist which does not depend solely on the success of the borrower’s business.
 
 American Processing and Sales Co. v. United States,
 
 371 F.2d 842, 856, 178 Ct.Cl. 353 (1967). The courts have devised guidelines to facilitate a determination of whether advances to a corporation constitute debt or equity.
 

 Decisions in this Circuit have stressed at least thirteen factors which merit consideration in determining this issue. They are:
 

 (1) the names given to the certificates evidencing the indebtedness;
 

 (2) the presence or absence of a fixed maturity date;
 

 (3) the source of payments;
 

 (4) the right to enforce payment of principal and interest;
 

 (5) participation in management flowing as a result;
 

 
 *1315
 
 (6) the status of the contribution in relation to regular corporate creditors;
 

 (7) the intent of the parties;
 

 (8) ‘thin’ or adequate capitalization;
 

 (9) identity of interest between creditor and stockholder;
 

 (10) source of interest payments;
 

 (11) the ability of the corporation to obtain loans from outside lending institutions;
 

 (12) the extent to which the advance was used to acquire capital assets; and
 

 (13) the failure of the debtor to repay on the due date or to seek a postponement.
 

 Estate of Mixon v. United States,
 
 464 F.2d 394, 402 (5th Cir.1972).
 

 The courts have stressed that these guidelines are not rigid rules mandating a particular conclusion when the court finds certain facts. It is our job not simply to count the factors applicable in a case, but, instead, to evaluate them.
 
 Tyler v. Tomlinson,
 
 414 F.2d 844, 848 (5th Cir.1969). “We review the relevant [factors] well aware that ‘[e]ach case turns on its own factors; differing circumstances may bring different factors to the fore.’ ”
 
 Jones v. United States,
 
 659 F.2d 618, 622 (5th Cir. Unit B 1981) (quoting
 
 Slappey,
 
 561 F.2d at 581). Although our courts have devised the above-mentioned guidelines as an aid in determining whether advances constitute debt or equity, we must bear in mind the dictates set forth in
 
 Tyler:
 

 As we have said elsewhere in situations requiring the quest for a solution among myriad criteria: ‘We think that the tests are, at most, helpful factors to be considered, and not fiats to be bound by. We disapprove of rubricating such “tests” into talismans of magical power.
 
 Georgia Southern and F. Ry. Co. v. Atlantic Coast Line R. Co.,
 
 5 Cir.1967, 373 F.2d 493, 498,
 
 cert. denied,
 
 389 U.S. 851, 88 S.Ct. 69, 19 L.Ed.2d 120.
 

 Tyler,
 
 414 F.2d at 848.
 

 The district court, in this case, examined those factors it deemed relevant and determined that Lane’s advances to the corporation constituted contributions to capital rather than loans and denied Lane’s claim for a refund of taxes paid in 1972. “The issue is primarily one of law. We must uphold the district court’s findings of basic facts unless clearly erroneous, but the ultimate characterization of the transactions as debt or equity receives no such protection.”
 
 Slappey,
 
 561 F.2d at 582 n. 17. “This evaluation presents primarily a question of law, and a district court’s determination of the issue is thus subject to a de novo review by this court.'’
 
 Estate of Mixon,
 
 464 F.2d at 402-03 (footnote omitted). We now review the debt-equity question, examining the facts of this case in light of those
 
 Mixon
 
 factors which are pertinent, relevant, and significant.
 

 (1) The Name Given to the Certificate.
 

 “The thrust of this factor is that the court will look to the type of certificate used by the parties in considering the debt-equity question.”
 
 Estate of Mixon,
 
 464 F.2d at 403. In this case, the vast majority of certificates used by the parties were notes. “[T]he issuance of a bond, debenture, or note is indicative of a bona fide indebtedness.”
 
 Estate of Mixon,
 
 464 F.2d at 403. Although the form of the instrument may be relevant,
 
 see Liflans Corporation v. United States,
 
 390 F.2d 965, 969, 182 Ct.Cl. 825 (1968), “[t]he decisive factor is not what the payments are called but what, in fact, they are, and that depends upon the real intention of the parties.”
 
 Byerlite Corporation v. Williams,.
 
 286 F.2d 285, 290 (6th Cir.1960). The mere fact that Lane set forth the advances to the corporations in the form of notes is not of significant importance in our determination of whether the advances constituted debt or equity. “While the issuance of a note may evidence a bona fide indebtedness, an unsecured note due on demand with no specific maturity date, and no payments is insufficient to evidence a genuine debt.”
 
 Stinnett’s Pontiac,
 
 730 F.2d at 638.
 

 (2) Presence or Absence of a Fixed Maturity Date.
 

 Thirteen notes or checks which Lane alleged to be evidence of debts were admit
 
 *1316
 
 ted into evidence. The district court found that of the thirteen, eleven were demand notes. A vast majority of the notes in question lacked a fixed maturity date:
 

 Q. O.K. Now, all of these or almost all of these were demand notes. Can you tell me why they were made demand notes?
 

 A. Well, if the corporation had gotten into a position to where they could pay and I had knowledge of that fact, I think I could have made demand with the very description of the word.
 

 Q. O.K. In other words, you didn’t want it to have any definite time. You just wanted to be able to take it out when it was convenient for you or the corporation. Is that right?
 

 A. Not when it was convenient, but when it was advisable or proper.
 

 Q. O.K. When it was good for your business or the corporation’s business? A. Right.
 

 Lane testified at trial that no repayment was made by the corporations of any of the principal owed to him. He received from the corporations only $2,700 and a 1974 van as interest payments on the outstanding debts.
 

 The
 
 Mixon
 
 court stressed that the absence of a fixed maturity date indicates that “repayment was in some way tied to the fortunes of the business, indicative of an equity advance.”
 
 Estate of Mixon,
 
 464 F.2d at 404. In this case, no fixed maturity date existed in the vast majority of the notes. Contrary to the fact situation in
 
 Mixon,
 
 in this case, no evidence exists whatsoever that reimbursement was reasonably contemplated within a short time of the advance.
 
 Estate of Mixon,
 
 464 F.2d at 405. Lane testified that he would only demand repayment when it was good for his business or the corporations’ business. The absence of a fixed date for repayment indicates that the advances were contributions to capital, and not loans.
 
 Stinnett’s Pontiac,
 
 730 F.2d at 638. We find the absence of a fixed maturity date to be an important indicator that the advances to the corporations constituted equity rather than debt. Repayment was tied solely to the success of the businesses. It is clear that in chosing to demand repayment only when “it was good for business,” Lane was describing not loans to the corporations, but contributions to capital.
 

 (3) The Intent of the Parties.
 

 It is “well-recognized in all areas of the law, that a
 
 subjective
 
 intent on the part of an actor will not alter the relationship or duties created by an otherwise objectively indicated intent.”
 
 Estate v. Mixon,
 
 464 F.2d at 407. A court must look not simply at self-serving declarations of the parties, but instead must examine those circumstances surrounding the transaction.
 
 Tyler,
 
 414 F.2d at 850.
 

 We must examine the circumstances surrounding the advances, the objective facts, to determine whether the parties intended the advances to constitute debt rather than equity. In this case, over $100,000 of Lane’s advances to the corporations contained no provision for the payment of interest. “[A] true lender is concerned with interest.”
 
 Curry v. United States,
 
 396 F.2d 630, 634 (5th Cir.),
 
 cert. denied,
 
 393 U.S. 967, 89 S.Ct. 401, 21 L.Ed.2d 375 (1968). What is equally relevant in this case is that even with those advances containing interest provisions, Lane had no firm expectation that interest would be paid on these advances. “I put the money in expecting repayment in full if not with interest.” Lane testified that interet payments made to him from the corporations were limited to a 1974 van and $2,700. “It is clear that the appellant was not seriously expecting any substantial interest income, but was interested in the future earnings of the corporation or the increased market value of his interest.”
 
 Curry,
 
 396 F.2d at 634. As the
 
 Slappey
 
 court stressed, “[wjhen a corporation contributor seeks no interest, it becomes abundantly clear that the compensation he seeks is that of an equity interest: a share of the profits or an increase in the value of his shareholdings.”
 
 Slappey,
 
 561 F.2d at 582.
 

 
 *1317
 
 The fact that over $100,000 in advances contained no interest provisions and that even with those notes containing interest provisions, Lane received only a van and $2,700 in interest payments, coupled with the fact that Lane sought repayment only when it was good for the corporations indicates objectively that Lne intended the advances to constitute contributions to capital rather than debt. In addition to the interest factors, the absence of a fixed maturity date lends further support to our conclusion that Lane and the corporations objectively intended the advances to constitute a contribution to capital.
 

 The question is not whether the parties intended to call their transaction ‘debt’ and thus to achieve advantageous tax treatment; that a person wants to pay less tax rather than more provides little basis for discerning how much tax Congress decided he should pay. Instead, the relevant inquiry is the actual manner, not the form, in which the parties intended to structure their relationship. If the intended structuring accords with the type arrangement that qualifies for taxation as debt, that intent supports a finding of debt. Here, however, the parties intended to structure their relationship in a manner placing funds at the prolonged risk of the businesses; they intended decisions whether to make payments on the advances to be based on the criteria usually associated with dividend decisions. To the extent that intent is relevant, it favors equity classification.
 

 Slappey,
 
 561 F.2d at 583 (footnote omitted).
 

 (4) The Right to Enforce Payment of Principal and Interest.
 

 The district court stressed that while Lane’s notes were enforceable, he took none of the customary steps which would assure repayment in the event the business failed. Not only were the advances unsecured, but no evidence exists that any sinking fund was established by which the principal and interest could be paid. The
 
 Tyler
 
 court, in finding that the advances were equity rather than debt, stated:
 

 Our conclusion in this regard is confirmed by the character of the notes themselves. These created no realistic creditor safeguards and no genuine expectations of payment. They contained no enforcement provisions, no specific maturity dates, and no
 
 sinking fund
 
 from which payments of interest and principal might be made.... Furthermore, the notes were
 
 unsecured.
 
 While they did contain a provision for payment on demand, such a provision cannot be realistically considered as manifesting a genuine interest in repayment in view of the financial condition of the corporation and the complete identity of shareholders and noteholders. A demand for payment of the Tyler notes would have completely havocked the corporation with bankruptcy as a possibility.
 

 Tyler,
 
 414 F.2d at 849 (emphasis added). Although a basic right to enforce payment may have existed, Lane took none of those customary steps which we would expect a lender to take to guaranty repayment in the event the business failed. The failure to secure the advances and the failure to establish a sinking fund lend support to our conclusion that the advances made by Lane to the corporations constituted equity rather than debt.
 

 (5) Failure of the Debtor to Repay on the Due Date or to Seek a Postponement.
 

 This factor and the earlier discussed intent of the parties factor are, we believe, the most telling of the
 
 Mixon
 
 factors.
 
 Slappey,
 
 561 F.2d at 582. As the district court held, the record is devoid of any evidence that the corporations, as to those advances made with notes containing due dates, made any meaningful attempt to repay those obligations. Except the payment to Lane of the 1974 van and $2,700, as interest and payments on several of the notes, no evidence exists that the corporations attempted to satisfy their obligations to Lane.
 

 The vast majority of the advances by Lane to the corporations were in the form of demand notes. Although Lane testified
 
 *1318
 
 that he asked “the corporations if they couldn’t accumulate funds to pay me back,” no evidence exists that he actually demanded payment on those eleven demand notes. “No due date existed on either the notes or the advances. The notes were due on demand, but Pontiac never demanded payment. A strong inference, therefore, exists that Stinnett never intended to compel Cargo to repay the advances.”
 
 Stinnett’s Pontiac,
 
 730 F.2d at 640. In an analysis of this
 
 Mixon
 
 factor, what becomes relevant is Lane’s testimony regarding the parties’ view of their relationship.
 
 Slappey,
 
 561 F.2d at 582.
 

 Q. All right, let me put it this way: if you could have gotten back a portion of these monies that the corporations owed to you by demanding them, but it would have caused the corporation to lose money and to lose business, you wouldn’t have done that; would you?
 

 A. Not at this time.
 

 Q. No, because you are trying to build them up. That’s right, isn’t it?
 

 A. Yes, and I am still hopeful of doing so.
 

 Q. O.K. Now, all of these or almost all of these were demand notes. Can you tell me why they were made demand notes?
 

 A. Well, if the corporation had gotten into a position to where they could pay and I had knowledge of that fact, I think I could have made demand with the very description of the word.
 

 Q. O.K. In other words, you didn’t want it to have any definite time period. You just wanted to be able to take it out when it was convenient for you or the corporation. Is that right?
 

 A. Not when it was convenient, but when it was advisable or proper.
 

 Q. O.K. When it was good for your business or the corporation’s business? A. Right.
 

 Lane’s description of his relationship to the corporations fits into the definition of an equity rather than debt relationship. Lane sought a return on his advances only when it would be in the best interest of the corporation. His own testimony indicates that his advances were placed “at the risk of the business,” and that he sought a return on his advances only when the corporations achieved a level of success.
 

 Walden’s testimony confirms these conclusions. He acknowledged that the individuals sought payments of principal or interest only when the corporations had ‘plenty of cash’ and that the investors did so because they were more concerned with their status as shareholders than as creditors. That statement of how the individuals viewed their situation corresponds almost perfectly to the classic equity situation. A corporation normally declares dividends only when it has ‘plenty of cash.’ Shareholders ordinarily acquiesce in such dividend policies because their primary concern is the health and long-term success of the enterprise. Walden’s statement indicates that the individuals here possessed precisely those motivations and that they believed it appropriate for the corporations to decide when to make payments on the same basis that corporations customarily make dividend decisions.
 
 See Berkowitz v. United States,
 
 411 F.2d 818, 821 (5th Cir.1969). The taxpayers’ pattern of conduct belies any intention to structure their affairs as parties to a debt transaction ordinarily would. In the circumstances here, these factors indicate that all the transactions should be characterized for tax purposes as equity arrangements.
 

 Slappey,
 
 561 F.2d at 582-83. Our examination of the record makes clear that Lane placed his advances to the corporations “at the risk of the businesses.” Lane’s testimony indicates that he was not a disinterested creditor lending money to a corporation with the intent to create a debt relationship, but instead was making a contribution to capital to the corporations, seeking repayment only if the corporations were successful.
 

 Under the analysis of the debt-equity relationship set forth in
 
 Slappey, Estate of Mixon,
 
 and
 
 Stinnett's Pontiac,
 
 we con-
 
 *1319
 
 elude that Lane’s advances to the three corporations constituted equity rather than debt, and as such, the district court’s judgment denying appellants’ (Prances B. Lane and James M. Gaines) tax refund claim is affirmed.
 
 [3]
 

 Lane contends that he was entitled to a section 166 business bad debt deduction based upon losses incurred as a result of guaranties of corporate obligations to institutional lenders. Due to the inability of the corporations to satisfy these institutional obligations, certain of Lane’s assets were sold to satisfy his duty under the guaranty. The issue now before this court is whether these guaranty losses give rise to a bad debt deduction.
 

 The district court denied Lane’s bad debt deduction claim as to the guaranty losses. The district court cited
 
 Putnam v. Commissioner,
 
 352 U.S. 82, 77 S.Ct. 175, 1 L.Ed.2d 144 (1956), for the proposition that:
 

 [U]pon the payment by the guarantor of the debt, the debtor’s obligation to the creditor becomes an obligation to the guarantor by subrogation. Thus, the loss sustained by the guarantor unable to recover the debt is by its very nature a loss from the worthlessness of a debt, and bad debt treatment under section 166 is appropriate. But
 
 Putnam
 
 teaches that such debts are non-business bad debts. They are treated as capital losses for purpose of deduction, with the comparatively undesirable limitations on such deductions.
 

 Both parties now state that the district court’s interpretation of the
 
 Putnam
 
 decision was incorrect. We agree. The
 
 Putnam
 
 decision does not stand for the proposition that all guaranty liability is characterized solely as debt. The court in
 
 Casco Bank and Trust Co. v. United States,
 
 544 F.2d 528 (1st Cir.1976),
 
 cert. denied,
 
 430 U.S. 907, 97 S.Ct. 1176, 51 L.Ed.2d 582 (1977), concluded that unsatisfied advances made in discharge of a guaranty are not as a matter of law bad debt losses. In interpreting the
 
 Putnam
 
 decision, the
 
 Casco
 
 court stressed that payments made as- a result of guaranties may be deemed contributions to capital rather than loans.
 
 Cas-co,
 
 544 F.2d at 535. Thus, contrary to the district court’s opinion in this case, the
 
 Putnam
 
 decision does not stand for the proposition that all unsatisfied advances made in the discharge of a guaranty are bad debt losses. Further support for the
 
 Casco
 
 court’s interpretation of the
 
 Putnam
 
 decision can be found in
 
 Kavich v. United States,
 
 507 F.Supp. 1339 (D.Neb. 1981).
 

 For purposes of I.R.C. § 166, guaranteed debts are treated as if the guarantor advanced to the principal obligor the amount covered by the guarantee. This is because ‘[tjhere is no real or economic difference between the loss of an investment made in the form of a direct loan to a corporation and one made indirectly in the form of a guaranteed ... loan.’
 
 Putnam v. Commissioner,
 
 352 U.S. 82, 92-93, 77 S.Ct. 175, 179-80, 1 L.Ed.2d 144 (1956). It appears from his brief that the plaintiff reads more into
 
 Putnam
 
 than is warranted. Plaintiff seems to contend that
 
 Putnam
 
 stands for the proposition that, as a matter of law, any guarantee which a taxpayer is required to honor gives rise to a § 166 deduction.... In the Court’s opinion,
 
 Putnam
 
 only says that loans and guarantees should be treated alike. Thus, it would be anomalous to then say that payments made pursuant to guarantees are
 
 not
 
 subject to the bona fide debt requirement. In sum, the plaintiff’s argument is invalid.
 
 See Casco Bank and Trust Company v. United States....
 

 Kavich,
 
 507 F.Supp. at 1342 n. 2.
 

 In determining whether the guaranty losses constituted debt or equity, the
 
 Ka-vich
 
 court reviewed debt-equity factors quite similar to those earlier discussed in the
 
 Estate of Mixon
 
 case.
 
 Kavich,
 
 507 F.Supp. at 1343. “No deduction is allowed the guarantor of a corporate obligation if, considering the circumstances as of the time of the creation of the guarantee obli
 
 *1320
 
 gation, the payment in satisfaction of the guarantee is in fact a shareholder contribution of capital to the corporation.”
 
 LaStaiti v. Commissioner of Internal Revenue,
 
 41 T.C.M. (CCH) 511, 518 (1980).
 

 Under all of the circumstances of this case, his motivation at the time he honored the guarantees is insufficient to sustain the claimed § 166 deductions. This is because the critical issue is whether, at the times the various guarantees were extended, the plaintiff created a debtor-creditor relationship with National Carpets, Inc.
 

 Kavich,
 
 507 F.Supp. at 1346 n. 8.
 

 As earlier analyzed, based upon a careful review of the
 
 Mixon
 
 factors, we concluded that the money advanced by Lane directly to the corporations constituted contributions to capital rather than loans. We carefully reviewed such factors as intent and failure of the debtor to pay on the due date or to seek a postponement. In applying these same factors to the guaranty situation, we must conclude that it was Lane’s intent at the time the guaranties were extended to use the guaranties as short-term substitutes for infusion of more capital stock.
 
 Kavich,
 
 507 F.Supp. at 1346. We pay close heed to the dictates set forth by the court in
 
 Plantation Patterns, Inc. v. Commissioner of Internal Revenue,
 
 462 F.2d 712, 722-23 (5th Cir.1972),
 
 cert. denied,
 
 409 U.S. 1076, 93 S.Ct. 683, 34 L.Ed.2d 664 (1972).
 

 The guarantee enabled Mr. Jemison to put a minimum amount of cash into New Plantation immediately, and to avoid any further cash investment in the corporation unless and until it should fall on hard times. At the same time he exercised total control over its management. Adding together the personal guarantee of Mr. Jemison to the guarantee of Jemi-son Investment Company, which was wholly owned by him and Mr. Jemison’s control of New Plantation, we think that the result is that Mr. Jemison’s guarantee simply amounted to a covert way of putting his money ‘at the risk of the business.’ Stated differently, the guarantee enabled Mr. Jemison to create borrowing power for the corporation which normally would have existed only through the presence of more adequate capitalization of New Plantation.
 

 Plantation,
 
 462 F.2d at 722-23.
 

 In examining Lane’s intent at the time of the creation of the guarantied obligations, we conclude that he sought to infuse capital contributions into the corporations.
 
 Kavich,
 
 507 F.Supp. at 1346. Lane, we hold, sought to use the guaranties in much the same manner that he sought to use the direct advances. He was acting not as a lender, but as one investing capital into the corporations, seeking repayment only if the corporations became successful. We conclude that the guaranties executed by Lane in regards to the institutional loans should be treated as equity advances rather than as bona fide debts.
 
 Kavich,
 
 507 F.Supp. at 1346. Lane’s intent in guarantying the loans is identical to the intent behind the earlier discussed advances to the corporations. The guaranties, like the direct advances, were designed by Lane to put his money “at the risk of the business,” to be repaid only when the corporations became successful. We thus conclude that the guaranties of the corporations’ obligations by Lane constituted a contribution to capital rather than a loan.
 

 We hold that appellants are not entitled to relief in their suit claiming a tax refund of $321,573. They are not entitled to a bad debt deduction under section 166 because the advances made by Lane to the three corporations and those corporate obligations to the institutional lenders that he personally guarantied constituted equity rather than debt. Because the guaranties and the direct advances are equity, appellants are not entitled to their claimed bad debt deduction.
 

 AFFIRMED.
 

 [1]
 

 . Title 26 U.S.C.A. § 166 (West 1978) provides, in pertinent part:
 

 § 166. Bad debts
 

 (a) General rule.—
 

 (1) Wholly worthless debts. — There shall be allowed as a deduction any debt which becomes worthless within the taxable year.
 

 (2) Partially worthless debts. — When satisfied that a debt is recoverable only in part, the
 
 *1314
 
 Secretary may allow such debt, in an amount not in excess of the part charged off within the taxable year, as a deduction.
 

 (b) Amount of deduction.—For purposes of subsection (a), the basis for determining the amount of the deduction for any bad debt shall be the adjusted basis provided in section 1011 for determining the loss from the sale or other disposition of property.
 

 (c) Reserve for bad debts.—In lieu of any deduction under subsection (a), there shall be allowed (in the discretion of the Secretary) a deduction for a reasonable addition to a reserve for bad debts.
 

 (d) Nonbusiness debts.—
 

 (1) General rule.—In the case of a taxpayer other than a corporation—
 

 (A) subsections (a) and (c) shall not apply to any nonbusiness debt; and
 

 (B) where any nonbusiness debt becomes worthless within the taxable year, the loss resulting therefrom shall be considered a loss from the sale or exchange, during the taxable year, of a capital asset held for not more than 1 year.
 

 (2) Nonbusiness debt defined.—For purposes of paragraph (1), the term "nonbusiness debt" means a debt other than—
 

 (A) a debt created or acquired (as the case may be) in connection with a trade or business of the taxpayer; or
 

 (B) a debt the loss from the worthlessness of which is incurred in the taxpayer’s trade or business.
 

 (e) Worthless securities.—This section shall not apply to a debt which is evidenced by a security as defined in section 165(g)(2)(C).
 

 (f)Reserve for certain guaranteed debt obligations.—
 

 (1) Allowance of deduction.—In the case of a taxpayer who is a dealer in property, in lieu of any deduction under subsection (a), there shall be allowed (in the discretion of the Secretary) for any taxable year ending after October 21, 1965, a deduction—
 

 (A) for a reasonable addition to a reserve for bad debts which may arise out of his liability as a guarantor, endorser, or indem-nitor of debt obligations arising out of the sale by him of real property or tangible personal property (including related services) in the ordinary course of his trade or business; and
 

 (B) for the amount of any reduction in the suspense account required by paragraph (4)(B)(i).
 

 (2) Deduction disallowed in other cases.— Except as provided in paragraph (1), no deduction shall be allowed to a taxpayer for any addition to a reserve for bad debts which may arise out of his liability as guarantor, endorser, or indemnitor of debt obligations.
 

 [2]
 

 . Title 26 C.F.R. § 1.166-l(c) (1983) provides, in pertinent part:
 

 (c)
 
 Bona fide debt required.
 
 Only a bona fide debt qualifies for purposes of section 166. A bona fide debt is a debt which arises from a debtor-creditor relationship based upon a valid and enforceable obligation to pay a fixed or determinable sum of money. A gift or contribution to capital shall not be considered a debt for purposes of section 166.
 

 [3]
 

 . We only discuss those
 
 Mixon
 
 factors deemed relevant and significant in this case.