IN THE OREGON TAX COURT

G. Dale and Audrey A. BELFORD
*v.*
DEPARTMENT OF REVENUE
(TC 2796)

G. Dale Belford represented plaintiffs.

Jerry Bronner, Assistant Attorney General, Department of Justice, Salem, represented defendant.

Decision for defendant rendered July 27, 1989.

**CARL N. BYERS, Judge.**

This is an income tax appeal for 1981 and 1984. Plaintiffs claimed a $100,000 ordinary loss on their 1984 return. By reason of carryback provisions, this loss also affected their 1981 return. Defendant's auditor disallowed the loss as an ordinary loss. Defendant contends that the loss is a capital loss.

Mr. Belford ("plaintiff") is an experienced certified public accountant and has been involved in several successful restaurant ventures. Through these experiences, he acquired a

degree of expertise in conceptualizing and creating new restaurant businesses. His successful business ventures led to the proposal and formation of two corporations. Concepts Investment Corporation ("CIC") was formed in October 1981 by plaintiff and others. In 1982 the other investors were bought out and CIC became entirely owned by plaintiff and his family business partnership.

About the same time, Restaurant Concepts, Inc. was organized. Its original purpose was to promote a specialty Dutch pancake. When it was determined that the pancake business was not feasible, plaintiff and his associates decided to produce and market a microwave pizza. With this change in direction, the corporate name was changed from Restaurant Concepts, Inc. to Timoteo's, Inc. Plaintiff testified that the reason a separate corporation was used was to allow employees to become shareholders and participate in its increase in value. Plaintiff did not want outsiders owning any interest in his family corporation. Timoteo's was a wholly owned subsidiary of CIC and filed consolidated federal income tax returns for the years 1983 and 1984.

Plaintiff testified that the production and marketing of a microwave pizza required research and development. The funding for such research and development came in the form of advances from plaintiff to CIC which were then advanced to Timoteo's. The total advances for 1983 were $185,000 and for 1984, $60,000. Plaintiff's last advance made to CIC was on September 25, 1984, for $5,000.

In January 1984, it became clear that most of the funds advanced were needed longer than originally anticipated. Accordingly, in January 1984, 10,500 shares of stock were issued for $105,000 of the advances. Plaintiff considered the rest of the advances as a debt owed to him.

On October 1, 1984, plaintiff caused CIC to be liquidated. The assets were distributed to its shareholders, Concept Investment Company, a family partnership. The family partnership sold the assets to Timoteo's at their original cost. This resulted in a capital gain to the partnership due to the depreciation that had been deducted. However, plaintiff, as a shareholder, incurred a substantial loss.

The primary issue in this case is whether the loss plaintiff suffered on the liquidation of CIC qualifies as an ordinary loss under Internal Revenue Code § 1244. As developed at trial, the issue turns on the answer to two questions:

(1) Were the "advances" to CIC debt or equity?

(2) Was CIC "largely an operating corporation" within the meaning of applicable federal regulations?

■■ Under Section 1244, an individual may treat a loss from the sale or exchange of stock of a small business as an ordinary loss rather than a capital loss. To obtain this result, numerous conditions of the statute must be met. One of the conditions requires the domestic corporation to derive more than 50 percent of its gross receipts from sources other than "royalties, rents, dividends, interests, annuities, and sales or exchanges of stock or securities." In other words, it must have more active income than passive income. Recognizing that this test is not adequate for all circumstances, the Internal Revenue Service promulgated Treas Reg § 1.1244(c)-1(e)(2) (1981) which provides in part:

"Notwithstanding the provisions of this subparagraph and of subparagraph (1) of this paragraph, pursuant to the specific delegation of authority granted in section 1244(e) to prescribe such regulations as may be necessary to carry out the purposes of section 1244, ordinary loss treatment will not be available with respect to stock of a corporation which is not largely an operating company within the five most recent taxable years (or such lessor period as the corporation is in existence) ending before the date of the loss."

Plaintiff maintains that more than 50 percent of CIC's income constituted active income. However, plaintiff's position requires him to reclassify corporate records of income accrued. For example, for the year 1984 plaintiff removes $10,082 of interest income as a "Reversal of Prior Period Expense Accrual - Not Income."[1] Plaintiff also shows "service fees" of $15,539 for 1984. There was no service fee income reported on the corporate income tax return for that period. Plaintiff makes the adjustments on the basis that the true

---

[1] Plaintiff appears to have mislabeled this reclassification because it is not an expense but was clearly reported as income on the federal income tax for the year ending 1984.

numbers were shortcut because of the consolidated returns. By his adjustments plaintiff increases the service fees to 69.1 percent of the gross income of CIC over the period of its existence from 1981 through 1984.

Defendant's auditor admittedly did not audit the corporate records. He was unable to testify as to any information except that contained in the corporate tax returns. However, plaintiff did not produce copies of the corporate records showing the entries which he claims were made. To the contrary, plaintiff acknowledged that the tax returns were prepared from the corporate books. If such is the case, the court fails to understand how plaintiff can reclassify the items in question.

If the corporate records contained the service fees earned, as plaintiff claims, it would be inconsistent to report the fees differently on the income tax returns. This is particularly true with regard to the years in which consolidated income tax returns were filed. The consolidated return itself makes the offsets. The accountants would not need to do it outside the return. Moreover, plaintiff claims that the corporation earned $3,539 in "outside" services fees for 1984. These fees were not reported on the income tax return. Outside service fees would not be affected by the corporate relationship of CIC to Timoteo's. The court questions how this amount could be on the corporate records but not reported on the income tax return.

In 1983, the income tax return reported $11,013 in service fees. Plaintiff increases this by $4,117 which he contends was reported as a reduction of expenses. This again, however, is inconsistent with plaintiff's claims that the *total* amount paid by Timoteo's to CIC for service fees was $5,500.

The court is not persuaded by claims based on accounting practices which are not reflected on the income tax returns. As indicated, plaintiff failed to bring forth any original corporate records or receipt books which would reflect his revised figures. Accordingly, the court finds that CIC was not "largely an operating corporation" but was an investment or holding company. This finding is consistent with plaintiff's own characterization on the income tax returns. Although plaintiff claims that this characterization was a thoughtless

choice on his part, that explanation is not particularly convincing. The finding is also consistent with the general organization and documents surrounding the two corporations. For example, plaintiff produced no agreements providing for service fees between CIC and Timoteo's.

■ . The second issue is whether plaintiff's advances to CIC were contributions to capital (equity) or loans (debt). Defendant's auditor testified that he considered them to be contributions of capital because plaintiff produced no loan documents, there was no repayment schedule and no fixed maturity date. These are characteristics of contributions to capital rather than debt.

Plaintiff's expectation of repayment from CIC was dependent upon the success of the new company. This was a start-up business which did not have a history of success. In addition, it is doubtful that CIC could have obtained loans from outside sources on the same terms as obtained from plaintiff. The court does not feel it is necessary to explore this issue exhaustively. Based on the factors listed and the cases cited in *Stinnett's Pontiac Service, Inc. v. I.R.S.,* 730 F2d 634 (11th Cir 1984), 84-1 USTC (CCH) ¶ 9406, and *Lane v. U.S.,* 742 F2d 1311 (11th Cir 1984), 84-2 USTC (CCH) ¶ 9817, plaintiff's advances cannot qualify as loans. If they were not loans but contributions to capital, then plaintiff's basis in his 1244 stock was not increased by such advances. Consequently, the losses attributable to the advances are capital rather than ordinary losses. The court so finds.

Based upon the above findings, the court must sustain the Department of Revenue's Opinion and Order No. 87-1347.

Costs to defendant.