HAROLD A. AND MOLLY S. SIGMON, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Sigmon v. Commissioner
Docket No. 16111-83
United States Tax Court
T.C. Memo 1988-377; 1988 Tax Ct. Memo LEXIS 405; 55 T.C.M. (CCH) 1567; T.C.M. (RIA) 88377; August 15, 1988; As amended August 16, 1988 Bart A. Brown, Jr. and Michael H. Brown, for the petitioners. *406 Robert J. Kastl, for respondent. HAMBLEN
MEMORANDUM FINDINGS OF FACT AND OPINION HAMBLEN, Judge: Respondent determined deficiencies in petitioners, [1] Federal income taxes as follows: Year
Deficiency
1972
$  99,621.56
1973
54,719.44
1975
258,444.79
1976
584,429.34
1977
128,114.92
After concessions by the parties, [2] the issues for decision are: (1) Whether petitioner's advances to, or payments on guarantees on behalf of, certain entities were loans or contributions to capital; and (2) If petitioner's advances, or payments on guarantees on behalf of, certain entities were loans, *407 whether the failure of these entities to repay these loans gave rise to business or nonbusiness bad debts deductible on petitioner's 1979 Federal income tax return. [3]
FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. The stipulation of facts and attached exhibits are incorporated herein by this reference. Petitioners resided in Summerton, South Carolina, *408 at the time they filed their petition with the Court. The 1979 Return and Amended Return
Petitioners filed a timely joint Federal income tax return for the 1979 tax year with the Memphis Service Center, Memphis, Tennessee. Included on that return was a net loss of $ 279,363, shown on Schedule C, Profit or (Loss) From Business or Profession, for "Harold A. Sigmon & Associates" (hereinafter referred to as "Associates"). The Schedule C described Associates' main business activity as investment and management. Associates was the trade name under which Sigmon conducted some of his various affairs. Also included in the 1979 return was a statement indicating that the return for 1979 was incomplete because, among other things: Various assets of the taxpayers, including their personal residence, were sold by creditors in 1979 in payment of loan guarantees for controlled corporations. The entire loss to the taxpayers is indeterminable at this time and has not been included, except for those items where the amounts are known. Taxpayers have advanced funds to several controlled corporations, some of which became uncollectible in 1979. All of these losses have not been claimed, *409 since some of the adjusted amounts have not been established. This statement also indicated the amended returns would be filed to report the above items when the necessary information became available. Petitioners filed an amended 1979 joint Federal income tax return (hereinafter referred to as the "1979 amended return"), received by the Memphis Service Center on October 19, 1983, which showed a negative adjusted gross income of $ 2,668,393. The 1979 amended return, among other things, amended the Schedule C filed for Associates with the original 1979 return. This amended Schedule C showed a "corrected" net loss for Associates of $ 2,751,726. On the amended Schedule C for Associates, petitioners claimed a bad debt deduction for amounts allegedly due Associates as set forth below: Name
Amount
Superior River Coal Co.
$   248,490
Blue Grass Coal Company, Inc.
447,380
Quality Coal Sales
78,826
Quality Processing, Inc.
47,500
Elar Coal Corp.
50,000
Carl Collins
207,196
Fred Cornett
16,856
William Eldridge
189,139
Johnny Franks
75,673
Total
$ 1,361,060
Also on this amended Schedule C, petitioners claimed *410 bad debt deductions in the amounts of $ 1,147,791 for additional amounts allegedly due petitioner from Superior River Coal Co. ("Superior River") and $ 196,387 for amounts allegedly due petitioner from Sigmon-Elkhorn Coal Corporation ("Sigmon-Elkhorn"). Respondent challenges for 1979 the bad debt deductions described above. As a result, for purposes of this case, respondent claims that petitioners' adjusted gross income for their 1979 year is in the amount of $ 132,618. In this case, however, petitioners have put into issue, through the evidence presented at trial and their briefs, the deductibility in 1979 of only the following items: Item
Amount
Promissory note due petitioner from
Superior River (see infra)
$   242,426.83
Open account indebtedness due Associates
from Superior River (see infra)
29,535.70
Indebtedness due petitioner from
Superior River as a result of the
petitioner's satisfaction of Superior
River's obligation to First National
Bank of Louisville (see infra)
1,107,312.10
Open account indebtedness due Associates
from Blue Grass Coal Company, Inc.
447,199.08
("Blue Grass") (see infra)
Total
[4] $ 1,826,473.71
*411 For purposes of this case, petitioners claim a net operating loss carryback from their 1979 year in the amount of $ 1,694,855.63 ($ 1,826,473.63 less adjusted gross income of $ 132,618 as determined by respondent). Background
Sigmon moved from North Carolina to eastern Kentucky in 1962 and went to work for his brothers who operated coal mines there. Over a period of years, Sigmon acquired interests in his brothers' companies and became knowledgeable in the operation and management of a coal business. During 1974, Sigmon and his brothers decided that it would be best if Sigmon left and went his separate way. Therefore, on July 26, 1974, Sigmon sold to his brothers his interests in certain coal-related businesses which Sigmon owned with these brothers. The selling price of these interests was cash in the amount of $ 5,684,968 and, in addition, the transfer to petitioner of a farm property and equipment *412 located at Summerton, South Carolina. The cash proceeds of the sale paid to petitioner with interest amounted to a total of $ 5,965,174, payable in installments, which Sigmon received in 1974, 1975, and 1976. [5] Funds received from the sale were channeled through Associates. In connection with this sale, Sigmon executed a covenant not to compete providing that for a period from the date of the agreement and ending May 31, 1976, he, directly or indirectly, would not engage in the coal mining, processing, or selling business with respect to coal operations or coal mined from east of Interstate 75 in Kentucky or deal in any coal property, as a buyer, seller, lessor or lessee, or otherwise, in Perry, Breathitt or Knott Counties, Kentucky. According to Sigmon, when he left his brothers, he *413 did not see much future in putting the money he received from this brothers into a lending institution and drawing on it. Rather, he stated, he wanted to build money into a sizeable fortune by becoming a "deal doer" in East Kentucky. By a "deal doer," Sigmon stated that: What I wanted to do was to use my knowledge of the coal in East Kentucky, and my knowledge of the people who were in the purchasing end of it, acquire leases covering those minerals, to get a contract to sell the coal to the ultimate consumer and, then, package those deals and sell them to various entities who were at that time hunting properties all over East Kentucky. When Sigmon left his brothers, he took with him Carl Collins ("Collins") and Johnny Franks ("Franks"). Sigmon, Collins, and Franks then went to Wolfe County, Kentucky, an area not covered by the covenant not to compete. According to Maxwell Barret ("Barret"), an attorney who represented Sigmon from 1975 until sometime in 1979 and who was a shareholder with Sigmon in some of the companies in issue, see infra, Franks and Collins were day-to-day mine managers for Sigmon. Barret contends that Sigmon gave Franks and Collins interests in certain *414 companies primarily as an incentive, and also, to hold them because they were absolutely critical to success in the coal business and Sigmon wanted to lock them in. According to Barret and Sigmon, Sigmon loaned Franks and Collins money to provide their equity in these companies. [6]
Harold A. Sigmon & Associates
In 1974, Sigmon rented office space under Associates' name, hired two secretaries, ordered stationery under Associates' name, and acquired a telephone listing under Associates' name. Late in 1974, Sigmon acquired a building in Hazard, Kentucky, as Associates' office headquarters. At this time, Sigmon retained a certificated public accountant and legal counsel to handle matters he conducted in Associates' name. Beginning for 1974 and continuing through 1979, Sigmon reflected the activities of Associates on his Federal income tax returns (Forms 1040) on a Schedule C. Beginning in 1975 and continuing through 1979, Sigmon maintained *415 in Associates' name a manual set of double entry accounting records consisting of a general journal, cash receipts journal, a cash disbursements journal, and a general ledger. [7] In September 1975, Sigmon hired a full-time bookkeeper to maintain these accounting records. In addition to accounts pertaining to items of income or expense reported on the Schedule C filed for Associates, the general ledger maintained in Associates' name (hereinafter referred to as the "general ledger") among other things, contained accounts relating to Coala Plantation and King Coal Stables for which income and expense items were reflected on separate Schedules F (Farm Income and Expenses) included with petitioners' Federal income tax returns for 1975 through 1979, and an account relating to a motion picture investment for which income and expense items were reflected on a separate Schedule C included with petitioners' Federal income tax returns for 1975 through 1977. Also included in the general ledger, among other things, were accounts relating to income or expense items which were included on Schedules A & B (Itemized Deductions and Interest and Dividend Income), Schedules D (Capital Gains and Losses), *416 and Schedules E (Supplemental Income Schedule) [8] for 1975 through 1979, and other items reflecting personal expenditures or assets. On his tax returns filed for the years in audit, Sigmon reported income or loss on Schedule E -- Supplemental Income Schedule for the following entities: Entity
Year or Years
Consolidated Trucking
1975 through 1977 [9]
Campton Coal
1976 and 1977
Al Mining
1976
Elmon Corp.
1977 [10]
Wolfe Corporation
1977 [11]
*417 The Schedule C's for Associates for the years in issue do not report income from the promotion or the sale of businesses or corporations controlled by petitioner. There is no evidence that petitioner sold any business as a going concern before or during the years in audit. Over the years, Sigmon had direct or indirect interests in many businesses. Some of these businesses are as follows: Consolidated Trucking, Inc.
Consolidated Trucking, Inc. ("Consolidated Trucking") was incorporated under the laws of the State of Kentucky on September 1, 1968. Consolidated *418 Trucking was formed to operate as a coal hauling company for various Sigmon companies. Sigmon owned 60 percent of the outstanding common stock of Consolidated Trucking. Collins owned the remaining 40 percent. During 1979, Collins withdrew as a shareholder of Consolidated Trucking, thereby leaving Sigmon as its 100 percent shareholder. Al Mining, Inc.
Al Mining, Inc. ("Al Mining") was incorporated on August 1, 1972, under the laws of the State of Kentucky. Its principal operations from 1976 through 1978 were conducted near Campton, Kentucky. Al Mining's principal business activity from 1976 through 1978 was contract coal mining for Campton Coal Properties ("Campton Coal"), see infra.
From August 1972 through August 1976, Sigmon owned 100 percent of the outstanding common stock of Al Mining. In August 1976, the shareholdings in Al Mining were adjusted and became as follows: Sigmon
60%
Collins
20%
Franks
10%
Luther Miller
10%
Sigmon was the person in charge of Al Mining and was responsible for financing its equipment. Al Mining completely terminated all its operations in August 1978, when it ceased mining activities on the Campton Coal *419 subleased property. On or about November 16, 1979, at a shareholders' meeting of Al Mining, the shareholders elected to place Al Mining in bankruptcy under Chapter 7 of the U.S. Bankruptcy Code. On February 8, 1980, Al Mining filed a voluntary petition for liquidation under Chapter 7 of the U.S. Bankruptcy Code with the U.S. Bankruptcy Court for the Eastern District of Kentucky, London Division. On February 11, 1980, the Bankruptcy Court appointed a trustee for Al Mining. As of the date of trial, the bankruptcy proceedings for Al Mining were still pending. Quality Coal Sales
Quality Coal Sales ("Quality Sales") was a Kentucky partnership formed on July 1, 1974. Quality Sales was engaged in the coal brokerage business. Its principal coal supply customers were various Sigmon companies. The initial partners of Quality Sales and their percentage interest in the company were as follows: Margaret L. Sigmon (daughter of Sigmon)
25.77%
Harold A. Sigmon, Jr. (son of Sigmon)
25.77%
Mary Beth Sigmon (daughter of Sigmon)
25.77%
Collins
17.84%
Donald C. Graves ("Graves")
2.42%
Gaylord Stacey ("Stacey")
2.42%
In 1975, Graves and Stacey withdrew as *420 partners from Quality Sales, thereby increasing the ownership interests of Margaret L. Sigmon, Mary Beth Sigmon, and Harold A. Sigmon, Jr. to 27.08 percent each and of Collins to 18.75 percent. Sigmon did not own a direct interest in Quality Sales because of the covenant not to compete. However, Sigmon financed Quality Sales and was its directing force. Sigmon's children were Sigmon's nominees and were involved in Quality Sales (and Quality Processing) as partners in order for Sigmon to circumvent the covenant not to compete. Quality Processing, Inc.
Quality Processing, Inc. ("Quality Processing") was incorporated as a Kentucky corporation on August 15, 1974. Quality Processing was formed to acquire a coal tipple, located near Campton, Kentucky, in Wolfe County, Kentucky. Beginning in 1976, Quality Processing's principal customer was Campton Coal. Until 1975, the shareholders of Quality Processing and their percentage interests were as follows: Margaret L. Sigmon
19.61%
Harold A. Sigmon, Jr.
19.61%
Mary Beth Sigmon
19.61%
Collins
17.65%
Franks
11.76%
Graves
5.88%
Stacey
5.88%
During 1975, the shareholdings in Quality Processing were adjusted. *421 After adjustment, the shareholders of Quality Processing and the percentage interest of each were as follows: Margaret L. Sigmon
22.9%
Harold A. Sigmon, Jr.
22.9%
Mary Beth Sigmon
22.9%
Collins
31.3%
Although Sigmon did not own a direct interest in Quality Processing, he financed the acquisition of the property and the construction of the coal tipple. C&S Fuels, Inc.
C&S Fuels, Inc. ("C&S") was incorporated under the laws of the State of Kentucky on February 1, 1976. Its principal operations were located near Hyden, Kentucky. C&S was formed to acquire coal mining equipment, coal leases, and strip mining permits. The shareholders of C&S were Sigmon, Collins, Franks, William Eldridge ("Eldridge"), Barret, and Clifton Webb. C&E was capitalized at $ 2,000 but no capital in fact was paid in. Wolfe County Coal Corporation
Wolfe County Coal Corporation ("Wolfe Corporation") [12] was incorporated on April 29, 1976, under the laws of the State of Kentucky. Its principal business operations were located near Campton, Kentucky. Wolfe Corporation was formed to acquire certain coal leases owned by Quality Sales and thereafter earn income through *422 leasing the coal underlying the leased properties. Wolfe Corporation was formed for the Campton Coal deal, see infra. Wolfe Corporation had 2,000 issued and outstanding shares of common stock which were held as follows: Sigmon
49.0%
Collins
41.0%
Franks
10.0%
By agreements dated May 5, 1976, June 28, 1976, and October 19, 1976, Quality Sales assigned to Wolfe Corporation its rights and interests under certain coal leases for the total amount of $ 150,000. Also, by an agreement dated October 19, 1976, Wolfe Corporation subleased its rights under the lease assigned to it by Quality Sales for an overriding royalty of which Wolfe Corporation netted $ 2,000,000 in cash at the closing to Campton Coal. Wolfe Corporation distributed to its shareholders a portion of the net amount (after payment of its expenses) of the advanced royalty paid Wolfe Corporation *423 pursuant to this sublease, approximately $ 1,400,000. Wolfe Corporation's shareholders used this distribution to pay their respective tax liabilities due to their gain arising from this advance minimum royalty payment, to contribute $ 500,000 to the capital of Superior River, and to advance $ 500,000 to Superior River, see infra, proportional to their interests in Wolfe Corporation. Wolfe Corporation completely ceased its business operations in August 1978, when Campton Coal ceased mining activities pursuant to the sublease. Campton Coal Properties
Campton Coal was formed as a limited partnership on June 29, 1976, under the laws of the State of Kentucky. Sigmon was one of the general partners. Campton Coal's principal business was to form, promote, and operate a coal mining operation customarily known at the time as an advance coal royalty tax shelter. Sigmon invested $ 225,200 in general and limited partnership interests of Campton Coal. Campton Coal sold the coal mined under the sublease to the Eastern Kentucky Power Cooperative ("Eastern Kentucky Power") pursuant to a contract assigned to Campton Coal by Quality Sales. Al Mining mined coal from the property subleased *424 to Campton Coal by Wolfe Corporation pursuant to a contract mining agreement dated October 19, 1976. Campton Coal completely ceased its business operations in August 1978, after Eastern Kentucky Power terminated its coal supply agreement with Campton Coal because of Campton Coal's failure to meet coal quality standards. Elmon Corporation
Elmon Corporation ("Elmon") was incorporated on August 5, 1976, as a Delaware corporation. Its operations were conducted at Hanging Rock, Ohio. Elmon was formed to acquire coal leases which would be mined through the use of contract miners and to obtain coal sales contracts under which coal mined by such contract miners would be sold. Although Elmon sold coal to a number of purchasers, a majority of the coal shipped by Elmon was sold to Big Rivers Electric Corporation ("Big Rivers") pursuant to a long-term coal supply contract. S.C.E. Coal Corporation ("S.C.E."), see infra, mined substantially all the coal properties under lease to Elmon pursuant to a contract mining agreement. Elmon shipped its coal through the Superior River barge facility, see infra, pursuant to the terms of a coal processing agreement. Big Rivers terminated *425 Elmon's coal supply contract effective June 15, 1979. The shareholders of Elmon and their ownership interests therein were as follows: Sigmon
60.00%
Eldridge
22.50%
Collins
17.50%
Elmon was capitalized at $ 1,000 but this capital was not paid in. During 1979, Sigmon acquired the shares of Elmon stock owned by Collins and Eldridge and thereby became Elmon's sole shareholder. Sigmon-Elkhorn Coal Corporation
Sigmon-Elkhorn was incorporated on October 26, 1976, under the laws of the State of Kentucky. It was formed to acquire and lease coal mining equipment to various Sigmon companies described herein. The shareholders and their respective percentage interests in the stock of Sigmon-Elkhorn were as follows: Sigmon
45.00%
Collins
15.75%
Eldridge
15.75%
Barret
13.00%
Franks
10.00%
Sigmon was the person in charge of Sigmon-Elkhorn. All of Sigmon-Elkhorn's equipment rental income was from related Sigmon companies. Sigmon-Elkhorn was highly leveraged and generally needed funds. New equipment acquired by Sigmon-Elkhorn was financed one hundred percent. Sigmon banked Sigmon-Elkhorn through other Sigmon companies by guaranteeing *426 Sigmon-Elkhorn's financing. S.C.E. Coal Corporation
S.C.E. was incorporated under the laws of the State of Kentucky on December 9, 1976. Its principal operations were located in Boyd and Carter Counties, Kentucky. S.C.E. was formed to act as contract miner for Elmon in mining leases owned by Elmon. Pursuant to the terms of the contract mining agreement between Elmon and S.C.E., Elmon provided substantially all the financing required by S.C.E. The shareholders and percentage ownership of each shareholder in S.C.E. were as follows: Sigmon
60.0%
Eldridge
22.5%
Collins
17.5%
S.C.E. was capitalized at $ 1,000 but this capital was not paid in. On or about November 16, 1979, at a shareholders' meeting of S.C.E., the shareholders elected to place S.C.E. in bankruptcy under Chapter 7 of the U.S. Bankruptcy Code. On February 8, 1980, S.C.E. filed a voluntary petition for liquidation under Chapter 7 of the U.S. Bankruptcy Code with the U.S. Bankruptcy Court for the Eastern District of Kentucky, London Division. On February 11, 1980, the Bankruptcy Court appointed a trustee for S.C.E. The record contains no further information pertaining to this bankruptcy *427 proceeding. Mary Beth Coal Co., Inc.
Mary Beth Coal Co., Inc. ("Mary Beth") was incorporated on December 9, 1976, under the laws of the State of Kentucky. Its principal operations were located in Leslie County, Kentucky. Mary Beth was formed to contract mine some of the "deep mine" reserves under leases held by Blue Grass, see infra.
The shareholders and their respective percentage interests in the stock of Mary Beth were as follows: Sigmon
45.0%
Collins
17.5%
Eldridge
17.5%
Barret
15.0%
Deborah Brown
5.0%
Mary Beth was capitalized at $ 2,000, but no capital in fact was paid in. Superior River Coal Co.
Superior River was incorporated as an Ohio corporation on July 31, 1975. Superior River's principal office was located at Hanging Rock, Ohio. Superior River was formed to, and did, acquire, construct, and operate a coal-loading dock and barge facility. In September 1975, Superior River leased certain real estate located in Hanging Rock, Ohio, as a site for Superior River's coal loading dock and barge facility. Sigmon got involved in Superior River because he wanted to get back into the coal business on a bigger scale than he *428 could in the Wolfe County area, but the covenant not to compete limited the area in which he could operate. The Superior River facility was located sufficiently close to the Hazard coal field while being situated outside of the area restricted by the covenant not to compete. Elmon was formed to hold leases that were needed, and Sigmon secured, in order for Superior River to succeed, and S.C.E. was formed to mine the coal on the leases held by Elmon. Sigmon was the person in charge of and the banker for Superior River, Elmon, and S.C.E. (Collectively Superior River, Elmon, and S.C.E. hereinafter sometimes are referred to as the "Elmon Group.") The initial shareholders of Superior River were Clifford Howard, Ronald Griffith, and Roger Griffith, each of whom owned 84 shares of the common stock of Superior River (the "Griffith Group"), and Sigmon who owned 300 shares of the common stock. Sigmon paid a nominal amount for his initial 300 shares of Superior River. When formed, Superior River had very low capital. In October 1976, the members of the Griffith Group withdrew as shareholders, Superior River was recapitalized, and it issued additional shares. At this time, Superior River *429 was recapitalized for $ 500,000. As of December 31, 1976, the stock ownership of Superior River was as follows: Sigmon
324.0 shares
54.00%
Eldridge
121.5 shares
20.25%
Collins
94.5 shares
15.75%
Franks
60.0 shares
10.00%
Sigmon purchased his additional 24 shares of Superior River from the members of the Griffith Group in October 1975, for $ 1,333.33 per share, or a total of $ 32,000. In addition, in October 1976, Sigmon contributed to Superior River his share of the $ 500,000 capital of Superior River, in the amount of $ 270,000. Accordingly, Sigmon's investment in his stock of Superior River totalled $ 302,000. This amount was reflected on the books and records of Associates as an investment in the capital stock of Superior River. On October 22, 1976, Sigmon advanced the principal amount of $ 245,000 to Superior River, evidenced by Superior River's unsecured, promissory note. This note bore interest at the rate of six percent per annum. The principal of and interest on this note was payable annually on the first day of January, commencing January 1, 1978, at the rate of 24.5 cents per ton of coal processed by Superior River during the *430 preceding year, with the payments to be applied first to the payment of accrued interest and any balance applied to principal. The entire unpaid balance of principal and interest on this note was due on January 1, 1984. This advance was recorded on the books and records of Associates as a note receivable and was recorded on the books and records of Superior River as a note payable. Superior River made one payment on this advance of $ 2,573.17 during 1978, leaving a balance at December 31, 1979, of $ 242,426.83. The record does not show whether Superior River accrued interest expense for this advance on its books and records. The record did not show whether Sigmon included any interest income from Superior River on Associates' Schedule C in 1978. At the same time that Sigmon advanced Superior River this $ 245,000, Collins and Franks also advanced Superior River the principal amounts of $ 205,000 and $ 50,000, respectively, on the same terms and conditions. Originally, it was anticipated that the capital costs for the Superior River facility would be in the range of $ 500,000 to $ 600,000. During construction, however, it became apparent that these estimated costs were too *431 low. Around the time that Superior River was recapitalized, it was believed that one million dollars would be sufficient, at least, as a down payment for the construction of the Superior River facility, including the cost of some needed equipment. [13] According to Barret, one million of the two million dollars advanced royalties that Sigmon, Franks, and Collins received from the Wolfe Corporation/Campton Coal deal went into Superior River -- one half in equity and one-half in debt. Between 1976 and December 31, 1979, Sigmon advanced additional amounts to Superior River and Superior River repaid a substantial portion of these additional amounts. Sigmon reflected these advances to Superior River as receivables from Superior River on Associates' books and reflected repayments as reductions of these receivables. Superior River reflected these amounts on its books as payables to Associates. At December 31, 1979, Associates' records reflected a balance due from Superior River for *432 these amounts of $ 29,535.70 ($ 16,533.54 plus $ 13,002.16, see below). The account names, debit and credit entries, and balances for the amounts put in issue for Superior River, as reflected in Associates' general ledger, are as follows: Account 116, A/R Superior River
Date
Debit
Credit
Balance
12/31/75
$   2,000.00
$    2,000.00 5/31/76
2,333.60
4,333.60 6/31/76 [sic]
1,200.00
5,533.60 7/31/76
6,500.00
12,033.60 8/31/76
1,215.43
13,249.03 9/30/76
9,000.00
22,249.03 10/31/76
$ 150.679.41
(128,430.38)
12/31/76
762,849.41
634,419.03 12/31/76
142,419.03
492,000.00 12/31/76
490,000.00
2,000.00 12/31/76
4,000.00
(  2,000.00)
6/30/79
2,500.00
1/31/79
372.13
6/30
2,500.00
10/31
3.51
(  2,375.64)
12/31
244.30
(  2,131.34)
12/31
1,725.00
12/31
372.13
12/31
20,439.42
12/31
421.67
16,533.54 Account 135, Notes Rec. Superior River
Date
Debit
Credit
Balance
12/31/76
$ 245,000.00
$ 245,000.00
12/31   $ 2,573.17
242,426.83
Account 135-A, N/R Superior River
Date
Debit
Credit
Balance
12/31/79
$   133,232.65
12/31   203,862.69
12/31   $ 1,457,359.53
12/31   40,528.97
$ 1,160,793.16
12/31   1,147,791.00
13,002.16
*433 Other than for the Account 135, Notes Receivable advance, these advances were not evidenced by notes or other instruments of indebtedness. The record does not show whether any interest was paid on any of these advances or how these advances were used by Superior River. Superior River also obtained independent financing in the form of an inventory and receivables line of credit. Initially, this financing was provided by Chemical Bank; but in 1978, the financing was placed with First National Bank of Louisville ("First National"). Sigmon guaranteed Superior River's obligation to First National and, to secure his guarantee, pledged certain personal assets to First National. According to Sigmon, the first guarantee he made for Superior River pertained to the receivables line of credit from Chemical Bank. Sigmon stated that the line of credit was used for operating capital that Superior River needed to service its contract with Big Rivers between the time that coal was shipped to Big Rivers and that company paid for it. Without the receivables financing, Sigmon stated, he would have had to advance Superior River the operating capital. There is no evidence that Sigmon received *434 any consideration from Superior River for this guarantee and pledge of security. In January 1978, Sigmon and petitioner Molly S. Sigmon ("Molly") advanced Elmon and Superior River the sum of $ 600,000. This $ 600,000 was actually received by Elmon. Superior River's obligation for this $ 600,000 advance was secured by a first mortgage and security interest in Superior River's leasehold interest described above and the equipment located thereon. The record does not show how these funds were used or whether any payments of principal or interest were made. [14]
On August 14, 1979, Sigmon and Molly foreclosed their mortgage securing the $ 600,000 loan described above. In connection with this foreclosure, Sigmon assumed certain equipment financing obligations of Superior River which constituted junior liens on the foreclosed property. At approximately the same time as Sigmon's foreclosure, First National called Superior River's inventory and accounts receivable line of credit. *435 Since the Superior River assets pledged as collateral for this line of credit were insufficient to cover the indebtedness to First National, the bank exercised its rights against the personal assets of Sigmon pledged as collateral therefor, in the net amount of $ 1,107,312.10. Since personal assets of Sigmon were used to satisfy obligations of Superior River to First National, Superior River there upon became indebted to Sigmon for this amount of $ 1,107,312.10. On their 1979 amended return, and in this case, petitioners claim that the amount of $ 271,962.53 owed to Associates by Superior River (the $ 242,426.83 outstanding from the $ 245,000 note and the $ 29,535.70 outstanding on the additional advances) constituted an allowable bad debt deduction for 1979 pursuant to section 166(a). [15] In this case, respondent concedes that Associates will not recover any portion of this amount from Superior River, but does not concede that all or any portion of such amount constituted a loan to Superior River; that, if a loan, all or any portion of such amount became uncollectible in 1979; or that, if a loan, such amount constitutes a business bad debt. *436 On their 1979 amended return, and in this case, petitioners claim that the amount of $ 1,107,312.10 owed to Sigmon [16] by Superior River constituted an allowable bad debt deduction for 1979 pursuant to section 166(a). In this case, respondent concedes that Sigmon will not recover any portion of this amount from Superior River, but does not concede that all or any portion of such amount constituted a loan to Sigmon; that, if a loan, all or any portion of such amount became uncollectible in 1979; or that, if a loan, such amount constitutes a business bad debt. Blue Grass Coal Company, Inc.
Blue *437 Grass was incorporated as a Kentucky corporation on June 18, 1975. Blue Grass' principal office was located in Bulan, Kentucky, and its principal business was the processing and tippling of coal. The initial shareholders of Blue Grass were a group of Lexington businessmen unrelated to Sigmon. In 1976, the initial shareholders of Blue Grass sold their interest in Blue Grass to Sigmon and certain of his associates. As of December 31, 1976, the stock ownership of Blue Grass was as follows: Sigmon
49.0%
Collins
17.5%
Eldridge
17.5%
Barret
16.0%
According to Barret, the anticipated capital costs of the Blue Grass operation were covered essentially by the equity capital of $ 900,000. Beginning in 1976 and ending in 1979, the records of Associates reflect that it advanced funds to Blue Grass. These advances are reflected as receivables from Blue Grass. Associates' records reflect payments from Blue Grass as repayments of these receivables. These advances to Blue Grass were reflected in the records of Blue Grass as payables to Associates. The books and records of Associates reflect a receivables balance from Blue Grass at December 31, 1979, totaling $ 447,199.08 *438 ($ 407,999.08 plus $ 39,200.00, see below), and the books and records of Blue Grass reflect a payables balance to Associates at December 31, 1979, in this same manner. The account names, debit and credit entries, and account balances for these accounts as reflected in Associates' general ledger are as follows: Account 121, Accounts Receivable Blue Grass Coal Co.
Date
Debit
Credit
Balance
12/31
$ 322,420.00
$ 322,420.00
4/77
111,250.00
433,670.00
12/31/77
6,731.00
440,401.00
2/28/78
$  3,000.00
437,401.00
12/31/78
13,500.00
450,901.00
12/31/79
315.47
12/31/79
24,832.45
12/31/79
17,754.00
407,999.08
Account 131, Notes Receivable -- Blue Grass Coal Co.
12/31/77
39,200.00
39,200.00
The advances were not evidenced by notes or other instruments of indebtedness. The record does not show whether any interest was paid on any of these advances, whether Blue Grass accrued any interest expense relating to these advances, or how the advances were used by Blue Grass. An advance by petitioner to Blue Grass of $ 17,000 in 1976 *439 specifically was designated as a down payment on a helicopter to be acquired by Blue Grass. Petitioner received no security interest in the helicopter, no note for the advance of the purchase money, and no interest income relative to the advance. According to Barret, Blue Grass grew out of the Wolfe Corporation deal. Blue Grass had been an existing company at the time the Wolfe Corporation deal was put together, but was undercapitalized, and encountered financial problems. Barret stated that Blue Grass looked like the right vehicle to use to put together another Campton Coal Properties deal but the tax laws changed and the deal for subleasing the coal leases fell through. Barret asserts that he decided to develop Blue Grass for sale. According to Barret, at this time, many companies, particularly oil companies, were acquiring coal operations in Eastern Kentucky. Barret also asserts that these oil companies wanted to buy an operating business and wanted to see a producing operation that had the basics of an ongoing staff from a production standpoint; therefore, Sigmon began to build an operating company. Barret contends that C&S Fuels and Mary Beth were formed to be contract *440 mining companies for Blue Grass. (Collectively Blue Grass, C&S Fuels, and Mary Beth sometimes hereinafter are referred to as the "Blue Grass Group.") According to Barret, Sigmon did not want to be in the coal business day in and day out. Barret asserts that Sigmon wanted to package a deal and liquidate -- to realize the value on the front end and get away from the continuing risk and the time commitments that operating a mining business entailed. We find these assertions contrary to the evidence as a whole. From this record, we find that Sigmon's investment in the Elmon Group, the Blue Grass Group, and Sigmon-Elkhorn was part of his plan to start up and operate an integrated coal business similar to the business operated by his brothers. The years 1974 and 1975 were "boom years" for the coal industry. The coal business never previously had experienced boom years like these and, since 1975 and until the time of trial, there were no boom years for the coal industry like 1974 and 1975. This boom resulted from a convergence of a number of facts including the 1973 Organization of Petroleum Exporting Countries ("OPEC") oil embargo, shortages of coal after a long mine workers strike *441 in late 1973 and early 1974, and other factors. During this period, the market price of coal increased from approximately $ 12 per ton to upwards of $ 50 per ton. At the same time, mining and transportation costs remained relatively constant. It was during this period that large companies which had not traditionally been in the coal mining business in eastern Kentucky began looking to acquire eastern Kentucky coal operations. Also during this time, Sigmon was prohibited by the covenant not to compete from engaging in the coal business in eastern Kentucky. In 1976 and into 1977, coal prices fell from their 1975 highs. However, some large companies, particularly the integrated oil companies, continued to be interested in getting into the coal business. In 1978 and 1979, as a result of the decreasing demand for coal and increasing supply of coal, coal prices fell dramatically. In addition, mining costs increased dramatically. Beginning in 1977 and through early 1979, Sigmon attempted to sell the stock of Blue Grass, C&S Fuels, and Mary Beth and/or the assets of these companies to various prospective purchasers. Negotiations with potential purchasers ended without a completed *442 sale, however. According to Sigmon, the Blue Grass companies were "the trout line sinker of the other group of companies." Sigmon asserts that at a meeting with one or more of his attorneys in 1978 held between Christmas and New Year's Day, they discussed what they were going to do on an ongoing basis because they could see that unless they could sell Blue Grass, Sigmon was not going to fund it anymore. Therefore, Sigmon contends, they decided "everybody would go gung-ho and try to market the [Blue Grass] group of companies * * *." However, they were not successful in this attempt. Sigmon then shut down the Mary Beth deep mine, attempted, unsuccessfully, to restructure the financing for the equipment, and subsequently, to restructure the financing for the equipment, and subsequently shut down all operations. On or about November 16, 1979, at a shareholders' meeting of Blue Grass, the shareholders elected to place Blue Grass in bankruptcy under Chapter 7 of the U.S. Bankruptcy Code. Blue Grass filed a voluntary petition for liquidation under Chapter 7 of the U.S. Bankruptcy Code with the U.S. Bankruptcy Court for the Eastern District of Kentucky, London Division, on February 8, 1980, and *443 the Bankruptcy Court appointed a trustee for Blue Grass on February 11, 1980. As of the date of trial, the bankruptcy proceedings of Blue Grass were still pending. Priority claims of $ 104,080 and unsecured claims of $ 721,215 were made in this bankruptcy case. Blue Grass' principal asset, a coal tipple, was sold by the trustee for the amount of $ 250,000 cash in excess of the debt secured by such asset. The parties have stipulated that, because of the applicability of the bankruptcy code principle of equitable subordination, Sigmon will not receive any distribution as a creditor of blue Grass under the bankruptcy proceedings involving Blue Grass. On their 1979 amended return, and in this case, petitioners claim that the amount of $ 447,199.08 owed to Associates by Blue Grass constituted an allowable bad debt deduction for 1979 pursuant to section 166(a). In this case, respondent concedes that Associates will not recover any portion of this amount from Blue Grass, but does not concede that all or any portion of such amount constituted a loan to Blue Grass; that, if a loan, all or any portion of such amount became uncollectible in 1979; or that, if a loan, such amount constitutes *444 a business bad debt. The Financial Condition of the Companies
According to Barret, the Sigmon companies were start-up companies which needed additional funds to continue their existence. Barret contends that Sigmon provided the bridge financing the companies needed with the hope that this interim financing would only be necessary until permanent financing could be obtained. Barret further contends that, if the interim financing had not been provided these companies, there would have been difficulties with maintaining these companies or the companies could not have grown at the rate they grew during that period of time. According to Barret, Superior River and Blue Grass ran into trouble in 1979 because the market stayed down, regulatory problems asserted themselves, and a number of personal disagreements occurred with destroyed the team concept that had been responsible for the success these companies had enjoyed. Taxable income or (loss) before net operating deductions and special deductions reflected on corporation income tax returns (forms 1120) or small business corporation income tax returns (forms 1120S) for the Elmon Group, the Blue Grass Group, and Sigmon-Elkhorn, *445 [17] are as follows: Tax Years Ending in
Company
1976
1977
1978
1979
The Elmon Group:
Superior River
($  19,205)
($  64,682)
$  31,262 Not filed
Elmon
No activity
(  114,953)
(  722,149)
($ 373,742)
S.C.E.
Not filed
(  127,311)
(  186,574)
Not filed
The Blue Grass Group:
Blue Grass
($ 557,743)
($  56,989)
$  19,972 Not filed
Mary Beth
Not filed
(   86,057)
(  230,315)
Not filed
C&S Fuels
Not filed
(   29,080)
(  821,015)
Not filed
Sigmon-Elkhorn
Not filed
($ 262,348)
($ 349,809)
Not filed
Retained earnings or (deficits) reflected on balance sheets filed with tax returns for the Elmon Group, the Blue Grass Group, and Sigmon-Elkhorn were as follows: Tax Years Ending in
Company
1976
1977
1978
1979
The Elmon Group:
Superior River
($ 19,205)
($  83,887)
($  64,184)
Not filed
Elmon
No activity
(    1,646)
(   7,338)
($ 7,338)
S.C.E.
Not filed
(  127,311)
(  338,401)
Not filed
The Blue Grass Group:
Blue Grass
($ 70,620)
($ 147,907)
$  81,978 Not filed
Mary Beth
Not filed
(   85,067)
(  338,376)
Not filed
C&S Fuels
Not filed
(   29,080)
(  922,558)
Not filed
Sigmon-Elkhorn
Not filed
($ 262,348)
$ 612,204)
Not filed
*446 Capital stock, paid-in or capital surplus, and undistributed loss reflected on balance sheets filed with the tax returns for the Elmon Group, the Blue Grass Group, and Sigmon-Elkhorn are as follows: Tax Years Ending in
Company
1976
1977
1978
1979
The Elmon Group:
Superior River
Common Stock
None shown
$ 500,000 $ 500,000 Not filed
Elmon
Common Stock
$   1,000
1,000 1,000 $     1,000 Undistributed Loss
(  114,953)
(  837,102)
(1,210,844)
S.C.E.
Common Stock
Not filed
1,000 1,000 Not filed
The Blue Grass Group:
Blue Grass
Capital Stock
2,000
900,950 900,950 Not filed
Paid-in or
Capital Surplus
199,600
none shown
none shown
Not filed
Mary Beth
Common Stock
Not filed
2,000 2,000 Not filed
C&S Fuels
Common Stock
Not filed
None shown
2,000 Not filed
Sigmon-Elkhorn
Common Stock
Not filed
$  250,000 $ 250,000 Not filed
Total assets, including intercompany receivables, [18] reflected on balance *447 sheets filed with the tax returns for the Elmon Group, the Blue Grass Group, and Sigmon-Elkhorn are as follows: Tax Years Ending in
Company
1976
1977
1978
1979
The Elmon Group:
Superior River
$    10,379
$ 1,494,368
$ 2,909,391
Not filed
Elmon
No activity
1,615,707
2,059,851
$ 745,618
S.C.E.
Not filed
138,830
454,259
Not filed
The Blue Grass Group:
Blue Grass
$ 1,024,729
$ 3,271,885
$ 3,972,594
Not filed
Mary Beth
Not filed
14,246
12,364
Not filed
C&S Fuels
Not filed
253,965
86,053
Not filed
Sigmon-Elkhorn
Not filed
$ 4,955,114
$ 5,151,358
Not filed
Total liabilities, including intercompany payables, reflected on balance sheets filed with tax returns for the Elmon Group, the Blue Grass Group, and Sigmon-Elkhorn are as follows: Tax Years Ending in
Company
1976
1977
1978
1979
The Elmon Group:
Superior River
$  29,584
$ 1,078,255
$ 2,473,575
Not filed
Elmon
No activity
1,731,306
2,903,288
$ 1,962,800
S.C.E.
Not filed
265,141
791,660
Not filed
The Blue Grass Group:
Blue Grass
$ 893,749
$ 2,518,842
$ 2,989,666
Not filed
Mary Beth
Not filed
97,313
348,740
Not filed
C&S Fuels
Not filed
283,045
1,006,611
Not filed
Sigmon-Elkhorn
Not filed
$ 4,967,462
$ 5,513,562
Not filed
*448 Owners' equity (total assets minus total liabilities), including intercompany transactions, for the Elmon Group, the Blue Grass Group, and Sigmon-Elkhorn are as follows: Tax Years Ending in
Company
1976
1977
1978
1979
The Elmon Group:
Superior River
($  19,205)
$ 416,113 $ 435,816 Not filed
Elmon
No activity
(  115,599)
(  843,437)
($ 1,217,182)
S.C.E.
Not filed
(  126,311)
(  337,401)
Not filed
The Blue Grass Group:
Blue Grass
$ 130,980 $ 753,043 $ 982,928 Not filed
Mary Beth
Not filed
(   83,067)
(  336,376)
Not filed
C&S Fuels
Not filed
(   29,080)
(  920,558)
Not filed
Sigmon-Elkhorn
Not filed
($  12,348)
$ 362,204)
Not filed
Notes or accounts receivable due from related corporations reflected on balance sheets filed with the tax returns for the Elmon Group, the Blue Grass Group, and Sigmon-Elkhorn are as follows: Tax Years Ending in
Company
1976
1977
1978
1979
The Elmon Group:
Superior River
-0-
-0-
$ 1,615,243
Not filed
Elmon
No activity
$ 913,096
1,108,340
$ 573,151
S.C.E.
Not filed
-0-
-0-
Not filed
The Blue Grass Group:
Blue Grass
-0-
$  26,000
$   948,222
Not filed
Mary Beth
Not filed
-0-
12,632
Not filed
C&S Fuels
Not filed
-0-
-0-
Not filed
Sigmon-Elkhorn
Not filed
-0-
-0-
Not filed
*449 Notes or accounts payable due to related corporations reflected on balance sheets filed with the tax returns for the Elmon Group, the Blue Grass Group, and Sigmon-Elkhorn are as follows: Tax Years Ending in
Company
1976
1977
1978
1979
The Elmon Group:
Superior River
-0-
-0-
$   205,107
Not filed
Elmon
No activity
$ 515,904
-0-
-0-
S.C.E.
Not filed
15,369
37,518
Not filed
The Blue Grass Group:
Blue Grass
-0-
-0-
1,051,301
Not filed
Mary Beth
Not filed
-0-
249,258
Not filed
C&S Fuels
Not filed
-0-
-0-
Not filed
Sigmon-Elkhorn
Not filed
638,072
1,127,181
Not filed
Total assets, liabilities, and owners' equity, eliminating intercompany transactions, for these companies are as follows: Tax Year Ending in
Company
1976
1977
Total Assets:
Elmon Group:
Superior River
$    10,379 $  1,494,368 Elmon
No activity
702,611 S.C.E.
Not filed
138,830 The Blue Grass Group:
Blue Grass
1,024,729 3,245,885 Mary Beth
Not filed
14,246 C&S Fuels
Not filed
253,965 Sigmon-Elkhorn
Not filed
4,955,114 Total
$ 1,035,108 $ 10,805,019 Total Liabilities:
Elmon Group:
Superior River
$    29,584 $  1,078,255 Elmon
No activity
1,215,402 S.C.E.
Not filed
249,772 The Blue Grass Group:
Blue Grass
893,749 $  2,518,842 Mary Beth
Not filed
97,313 C&S Fuels
Not filed
283,045 Sigmon-Elkhorn
Not filed
4,329,390 Total
$ 923,333 $  9,772,019 Owners' Equity:
Elmon Group:
Superior River
($    19,205)
$    416,113 Elmon
No activity
(     512,791)
S.C.E.
Not filed
(     110,942)
The Blue Grass Group:
Blue Grass
130,980 727,043 Mary Beth
Not filed
(      83,067)
C&S Fuels
Not filed
(      29,080)
Sigmon-Elkhorn
Not filed
625,724 Total
$   111,775 $  1,033,000 *450 Tax Year Ending in
Company
1978
1979
Total Assets:
Elmon Group:
Superior River
$  1,294,148 Not filed
Elmon
951,511 $ 172,467 S.C.E.
454,259 Not filed
The Blue Grass Group:
Blue Grass
3,024,372 Not filed
Mary Beth
12,364 Not filed
C&S Fuels
86,053 Not filed
Sigmon-Elkhorn
5,151,358 Not filed
Total
$ 10,974,065 $   172,467 Total Liabilities:
Elmon Group:
Superior River
$  2,268,468 Not filed
Elmon
2,903,288 $ 1,962,800 S.C.E.
754,142 Not filed
The Blue Grass Group:
Blue Grass
1,938,365 Not filed
Mary Beth
99,482 Not filed
C&S Fuels
1,006,611 Not filed
Sigmon-Elkhorn
4,386,381 Not filed
Total
$ 13,356,737 $ 1,962,800 Owners' Equity:
Elmon Group:
Superior River
($    974,320)
Not filed
Elmon
(   1,951,777)
($ 1,790,333)
S.C.E.
(     299,883)
Not filed
The Blue Grass Group:
Blue Grass
1,086,007 Not filed
Mary Beth
(      87,118)
Not filed
C&S Fuels
(     920,558)
Not filed
Sigmon-Elkhorn
764,977 Not filed
Total
($  2,382,672)
($ 1,790,333)
*451 The debt-to-equity ratios (total liabilities divided by owners' equity), eliminating intercompany transactions, for these companies, in the aggregate, for the tax years ending in 1976 and 1977, were 8.3 to 1 and 9.5 to 1, respectively. [19]
According to Sigmon, the last day of any activity in any company, as far as actively processing and mining coal, was June 26, 1979. Sigmon stated that, at the time of the trial, he had not collected any amounts of *452 money from Superior River or Blue Grass. Sigmon was president and the person in charge of Quality Processing, Quality Coal, Consolidated Trucking, Blue Grass, Superior River, Wolfe Corporation, Mary Beth, Elmon, S.C.E., Sigmon-Elkhorn, C&S Fuels, and Al Mining. Superior River, Elmon, S.C.E., Blue Grass, Mary Beth, C&S Fuels, and Sigmon-Elkhorn were related corporations. These corporations were so integrally related operationally and financially that the success or failure of one would impact upon the others. Funds provided by petitioner to Superior River and its related corporations were required for their continued existence as start-up companies. Generally, no notes existed for advances by petitioner to the various corporations he controlled. With the exception of $ 10,799 reported for the year 1978, no interest was paid by corporations controlled by petitioner with respect to advances he made to those corporations. The coal business is a very risky business. Sigmon's coal operations were structured through multiple corporations in an attempt to reduce losses should a major catastrophe occur. Substantial amounts of loans and intercompany receivables and payables existed *453 among Sigmon's related corporations. No notes existed relative to intercompany advances made among the various corporations controlled by petitioner. From 1974 on, Sigmon made numerous investments and investigated numerous investment opportunities. During the years in issue, Sigmon did not receive any fee, at least in a traditional fee-paying arrangement, for promoting and developing corporations or for making loans to corporations. Sigmon's investment in Superior River, Elmon, S.C.E., Blue Grass, Mary Beth, C&S Fuels, and Sigmon-Elkhorn was not part of any business of promoting, financing, or making loans to corporations. We found Sigmon to be evasive. He had selective recall about transactions occurring in 1975 through 1979, and "convenient" memory lapses about certain relevant issues. He was not a credible witness. OPINION Section 166 generally allows deductions for debts which become worthless. Sec. 166(a). To be entitled to the deduction, petitioner must prove the existence of a bona fide debtor-creditor relationship which obligates the debtor to pay petitioner a fixed or determinable sum of money. A gift or contribution of capital cannot be considered a debt. *454 Sec. 1.166-1(c), Income Tax Regs. With respect to noncorporate taxpayers, and for the purposes of this case, the debt must be "created or acquired * * * in connection with" the taxpayer's trade or business. If the debt is not so created or acquired, it is a "nonbusiness debt," and the loss on the worthlessness of the debt is deductible only as a short-term capital loss. Sec. 166(d). Losses incurred with respect to guarantees of loans may also be deductible as bad debts under certain circumstances. If a taxpayer sustains a loss as a result of discharging his obligation as a guarantor of a corporate obligation, the loss is generally deductible as a nonbusiness bad debt if the guarantee is a transaction entered into for profit. However if the loss was incurred in connection with the guarantor's trade or business, payments in satisfaction of the guarantee are fully deductible business bad debts. See sec. 1.166-9(b), Income Tax Regs.; Putnam v. Commissioner,352 U.S. 82, 85, 88 (1956). No deduction is allowed the guarantor of a corporate obligation, however, if, considering the circumstances at the time of the creation of a guarantee obligation, the payment in *455 satisfaction of the guarantee is in fact a shareholder contribution of capital to the corporation. Sec. 1.166-9(c), Income Tax Regs.; Casco Bank & Trust Co. v. United State,544 F.2d 528, 534-535 (1st Cir. 1976), cert denied 430 U.S. 907 (1977); Santa Anita Consolidated Inc. v. Commissioner,50 T.C. 536, 550 (1968). See French v. United States,487 F.2d 1246, 1248-1249 (1st Cir. 1973). [20]
Whether a shareholder's advances to a corporation or a shareholder/guarantor's payments of corporate obligations are to be characterized as bona fide debts or capital contributions is a question of fact which must be determined from the circumstances of each case and based on all the evidence. Dixie Dairies Corp. v. Commissioner,74 T.C. 476, 493 (1980); Thompson v. Commissioner,73 T.C. 878, 894 (1980). Petitioner has the burden of proof on this issue. Welch v. Helvering,290 U.S. 111 (1933); Dixie Dairies Corp., supra; Rule 142. In resolving the issue of whether advanced funds *456 or a shareholder/guarantor's payment of corporate obligations are a capital contribution or debt, this Court and others have considered a myriad of factors. Dixie Dairies Corp. v. Commissioner,74 T.C. at 493. Among the factors considered are: (1) the manner of reporting the advances on the books of the parties involved; Byerlite Corp. v. Williams,286 F.2d 285, 290 (6th Cir. 1960); Litton Business Systems, Inc. v. Commissioner,61 T.C. 367, 378 (1973); (2) the identity of interest between the transferor of funds and stockholder; Fin Hay Realty Co. v. United States,398 F.2d 694 (3d Cir. 1968); Smith v. Commissioner,370 F.2d 178, 180 (6th Cir. 1966), affg. a Memorandum Opinion of this Court; (3) use of the amounts received; Estate of Mixon v. United States,464 F.2d 394, 402 (5th Cir. 1972); Wood Preserving Corp. of Baltimore v. United States,347 F.2d 117, 120 (4th Cir. 1965); (4) the length of the transaction; Byerlite Corp. v. Williams,286 F.2d at 291; (5) actual repayment of the advances comporting with the terms of the transaction; Estate of Mixon v. United States,464 F.2d at 402; *457 Gooding Amusement Co. v. Commissioner,23 T.C. 408, 419 (1954), affd. 236 F.2d 159 (6th Cir. 1956); (6) the ratio of debt-to-equity; Post Corp. v. United States,640 F.2d 1296, 1307 (Ct. Cl. 1981); (7) security provided for the repayment of the advances; A. R. Lantz Co. v. United States,424 F.2d 1330, 1334 (9th Cir. 1970); Wood Preserving Corp. of Baltimore v. United States,347 F.2d at 119; (8) the recipient's ability to repay the advances; C. M. Gooch Lumber Sales Co. v. Commissioner,49 T.C. 649, 657-658 (1968), remanded pursuant to agreement of the parties 406 F.2d 290 (6th Cir. 1969); (9) the recipient's ability to obtain financing from an independent lender; Smith v. Commissioner, 37 F.2d at 180; Georgia-Pacific Corp. v. Commissioner,63 T.C. 790, 797-798 (1975); (10) provisions for interest; Dixie Dairies Corp. v. Commissioner,74 T.C. at 494-495; (11) subordination of the right to repayment to other debts of the recipient; Charter Wire, Inc. v United States,309 F.2d 878, 880 (7th Cir. 1962), cert. *458 denied 372 U.S. 965 (1963); Litton Business Systems, Inc. v. Commissioner,61 T.C. at 378; (12) execution of an instrument of indebtedness; Matter of Uneco, Inc.,532 F.2d 1204, 1210 (8th Cir. 1976); Post Corp. v. United States,640 F.2d at 1304; and (13) a pattern of repeated shareholder advances, as opposed to a single outlay; Green Bay Structural Steel, Inc. v. Commissioner,53 T.C. 451, 458 (1969). [21] Since an appeal in this case would lie in the United States Court of Appeals for the Fourth Circuit, we will follow the opinions of that court in analyzing the transactions involved here. Golsen v. Commissioner,54 T.C. 742 (1970), affd. 445 F.2d 985 (10th Cir. 1971), cert. denied 404 U.S. 940 (1971). In Road Materials v. Commissioner,407 F.2d 1121, 1125 (4th Cir. 1969), remanding on other grounds a Memorandum Opinion of this Court, the Fourth Circuit listed several *459 factors it considered important in resolving the debt versus equity dispute: "Lack of principal and interest payments, the absence of a maturity date, the doubtful prospects of repayment, the debt-equity ratio, and the unlikelihood of obtaining similar unsecured loans from disinterested investors are pertinent criteria." (Fn. ref. omitted.) This list was not intended to be exclusive. The Fourth Circuit also has considered such factors as: the relationship of the one advancing the funds to the stockholdings of the company receiving the funds; the presence or absence of written instruments evidencing the advances; the presence or absence of security; the presence or absence of a schedule of repayment; the real intent of the parties considering all the relevant surrounding circumstances; whether repayment of the loan depended on the future success of the business; how the parties treated the advances; whether the notes were subordinated to other debts; and whether the advances were in proportion to the equity interest of the shareholders. See Piedmont Minerals Co. v. United States,429 F.2d 560 (4th Cir. 1970); Wood Preserving Corp. of Baltimore, Inc. v. United States, supra; *460 Jewell Ridge Coal Corp. v. Commissioner,318 F.2d 695 (4th Cir. 1963), affg. a Memorandum Opinion of this Court; Wachovia Bank & Trust Co. v. United States,288 F.2d 750 (4th Cir. 1961). The real intent of the parties is not to be derived solely from their testimony; all the relevant surrounding circumstances must be considered. A court is not bound by what the parties say they intended if their actions were inconsistent with their words. Wood Preserving Corp. of Baltimore, Inc. v. United States,347 F.2d at 119. The court in Road Materials also noted that bookkeeping entries were not determinative and that the substance of the transaction determined the tax consequences, not the form. We are not required to accept petitioner's testimony that the parties intended to create a debtor-creditor relationship. Instead, we must determine from all the surrounding facts and circumstances that an unconditional obligation to repay the advances existed notwithstanding the lack of success of the venture. Road Materials v. Commissioner,407 F.2d at 1124; Wachovia Bank & Trust Co. v. United State, supra. *461 [22]
The enumerated factors are only an aid to resolving the question of whether shareholder advances or guarantor payments of corporate obligations constitutes indebtedness for Federal income tax purposes. Dixie Dairies Corp. v. Commissioner,74 T.C. at 494. No single factor is ordinarily decisive in determining whether a shareholder's advance or guarantee is to be characterized as a bona fide debt or a capital contribution. See John Kelley Co. v. Commissioner,326 U.S. 521, 530 (1946). Characterization of such funds as capital contributions or debt must be answered by reference to all the evidence. Dixie Dairies Corp. v. Commissioner,74 T.C. at 493. However, this Court has stated that: [t]he determinative question, to which an evaluation of the various independent factors should ultimately point, is as follows: Was there a genuine intention to create a debt, with a reasonable expectation of repayment, and did that intention comport with the economic reality of creating a debtor-creditor relationship?
Litton Business Systems, Inc. v. Commissioner,61 T.C. at 377; *462 accord Gilbert v. Commissioner,74 T.C. 60, 65 (1980). Moreover, "[I]n all cases, the prevailing consideration is that artiface must not be exalted over realty." Byerlite Corp. v. Williams,286 F.2d at 291. The usual presumption of the correctness of respondent's determination applies in making the determination as to the nature of the shareholder advances or guarantor payments of corporate obligations. Gooding Amusement Co. v. Commissioner,23 T.C. at 421. With these principles in mind, we now examine the separate transactions in issue to determine whether the advances or payments on guarantees constitute debt or contributions to capital. Promissory note dueSigmon from Superior River
This item, in the amount of $ 242,426.83, represents the balance outstanding of the $ 245,000 Sigmon advanced to Superior River on October 22, 1976. This advance was evidenced by a promissory note bearing interest at a rate of six percent. It was recorded as a note receivable on Associates' books and records and a note payable on Superior River's books and records. Petitioner claims that this advance was a bona fide loan to Superior *463 River. Respondent, on the other hand,contends that this advance was a contribution to the capital of Superior River. Upon consideration of all the relevant facts and circumstances, we agree with respondent that, in reality, this advance was a contribution to capital. In support of his contention that the advance was a loan, petitioner points to the fact that both Associates and Superior River consistently recorded the advance as a loan. Bookkeeping entries, however, are not determinative. Substance, not form, controls. Road Materials v. Commissioner, supra.The $ 245,000 advance in issue here was made in conjunction with Superior River's recapitalization. Similar loans were made by two of the three remaining shareholders, and the funds were used to acquire capital assets (the barge facility and needed equipment) or for meeting expenses needed to commence operations. The timing of the advance and the use of the funds support a finding that the advance was a contribution to capital. See United States v. Henderson,375 F.2d 36 (5th Cir. 1967), cert. denied 389 U.S. 953 (1967). Although the advance was evidenced by a promissory *464 note, the note was unsecured. Sigmon reported no interest income from Superior River on his 1978 tax return and it appears that no interest in fact was paid. Associates' books and records show one payment of principal in the amount of $ 2,573.17 made on this advance; thus, this payment, if in fact made, appears to have been made outside the terms of the note which required payments to be applied first to interest and then any balance applied to principal. Moreover, repayment of this advance depended upon Superior River's future success and the risk of Superior River failing was high. The advance was not proportional to Sigmon's equity interest in Superior River. [23] This factor is inconsequential in relation to the other factors however. Sigmon held the controlling interest in Superior River; he was its president, and the acknowledged person in charge of the company. It is obvious from this record that Sigmon had complete control over all phases of Superior River's operations, including its funds. He, therefore, was free to make repayments to himself if and when funds were available. Sigmon did credit himself with one payment on the promissory note. Nevertheless, although *465 nonproportionality and repayments help support the argument that this advance constituted a bona fide debt, these factors are not conclusive and must be considered with all the evidence. See Diamond Bros. Co. v. Commissioner,322 F.2d 725, 732 (3d Cir. 1963), affg. a Memorandum Opinion of this Court. Sigmon's control over Superior River precluded any arm's-length relationship and any realistic expectation that a demand for payment would be made or legal enforcement actions would be taken. See Texas Farm Bureau v. United States,725 F.2d 307, 313 (5th Cir. 1984). Furthermore, the fact that the repayment for this advance was not made in accordance with the terms of the promissory note also supports a finding that the advance was not a bona fide indebtedness. *466 The coal business being a risky business,a true lender would demand a high rate of interest. The note here provides for only a six percent rate which appears to be rather low interest rate considering the risk involved. It is clear that Sigmon was not seriously expecting any substantial interest income, but was interested in the future earnings of the corporation, or the increased market value of his interest. See Curry v. United States,396 F.2d 630, 634 (5th Cir. 1968). This factor also supports a finding that the advance was a contribution to capital, not a bona fide debt. The record does not show what Superior River's debt-to-equity ratio was at the time that the advance was made. Barrett stated that at the time Superior River was recapitalized, they believed one million dollars would be sufficient, at least, as a down payment for the barge facility and some equipment and that one-half of this one million dollars would come from debt. Thus, at a minimum, the debt-to-equity ratio at that time was one to one. It appears, however, that this 1-to-1 ratio misrepresents the true debt position of Superior River since indebtedness more than likely incurred in *467 starting-up the barge facility's operations is not reflected in that calculation. [24]
Based on this record, it appears that, considered alone, Superior River had substantial equity and a reasonable debt-to-equity ratio. We believe, however, that considering solely Superior River's ratio of debt-to-equity distorts the economic realities of Sigmon's integrated coal business. The barge facility was merely one link in the chain of interrelated companies [25] that together formed that business. The success of one company depended upon the success of the others -- evidenced by the fact that when Elmon lost its contract with Big Rivers, it and the other companies fell like dominoes. In addition, we note that the capital in fact was not paid in for Elmon, C&S, S.E.C., and Mary Beth. As far as we could determine, the ratio of debt-to-equity for these companies combined, eliminating intercompany transactions, for the fiscal year ending July 31, 1977 (the *468 year in which the advance was made) was 9.5 to 1. This ratio indicates that the companies as a group were thinly capitalized. The large deficits in retained earnings and negative owners' equity for most of these companies also supports our finding that the integrated coal business operated by Sigmon was thinly capitalized. This factor further supports our conclusion that this advance represented a contribution to capital. Moreover, it appears that Superior River could not have secured similar loans from disinterested parties. Although the note did contain a fixed maturity date, it was unsecured and payments were based on tonnage of coal processed. Since *469 the note was not secured, it was in essence subordinated to other secured creditor obligations. Superior River had deficits in retained earnings for all years of its existence, and, except for fiscal year ending July 31, 1978, [26] had losses in operations. Superior River was in a business known for its risks and repayments depended on the future success of that business. Thus, we believe that this advance was much more speculative than an outsider lender would make -- it was a loan in name only. See Fin Hay Realty Co. v. United States,398 F.2d at 697. Consequently, we conclude that petitioner did not have a reasonable expectation of repayment regardless of the success of Superior River. The $ 245,000 advance was put at the risk of the corporate venture and, therefore, was in actuality a contribution to capital. See Gilbert v. Commissioner,248 F.2d 399, 406 (2d Cir. 1957), cert. denied 359 U.S. 1002 (1959). *470 Open account indebtedness due Associates from Superior River
This item, in the amount of $ 29,535.70, represents the balances outstanding ($ 16,533.54 shown in Account 116 and $ 13,002.16 shown in Account 135-A) on advances Sigmon through Associates made at various times to Superior River. For the reasons set forth above and below, we believe that these advances also were contributions to capital. The record does not show the exact dates on which these advances were made. The entries in Associates' general ledger show a date of December 31, 1979 (apparently the date of posting to that ledger). [27] On this record, we must assume that the advances which remained outstanding as of December 31, 1979, were made in 1979, probably between July 1, 1979, and December 31, 1979. This is the same year in which Big Rivers terminated its coal supply contract with Elmon (June 15, 1979), all activity as far as actively processing and mining coal ceased (June 26, 1979), and the shareholders of S.C.E. and Blue Grass elected to place those companies in bankruptcy (November 16, 1979). [28] We believe these advances were made at a time when Superior River was insolvent. *471 These advances were unsecured, were not evidenced by written instruments, had no fixed maturity date, or any provision for repayment of principal or interest. No interest was paid on these advances. The advances in essence were subordinated to the debts of Superior Rivers's secured creditors. Sigmon had complete control over Superior River. We further believe that, at the time these advances were made, no funds could be borrowed from outside sources and Sigmon had no reasonable expectation of repayment. Petitioner has presented no evidence to establish otherwise. Since petitioners bear the burden of proof, they must suffer the consequences of an inadequate record. See Samis v. Commissioner,76 T.C. 609, 617 (1981). The absence of fixed, realistic dates for repayment, the failure to provide for meaningful enforcement mechanisms, the dependence of Superior River upon its earnings to repay the advances, the defacto subordination of the Superior River debt to other debt, and the lack of emphasis on interest cut strongly against the notion that the advances were debt. Analysis of these factors shows us the true and unambiguous nature of Sigmon's advances to *472 Superior River. Sigmon hoped to profit by his relationship with Superior River and, thus, furnished the capital in the form of these advances to keep it going. See Texas Farm Bureau v. United States,725 F.2d 307, 314 (5th Cir. 1984). According to Sigmon, he made the loans [29] or advances to these various companies in issue because I wanted to be ready when my covenant not to compete clause expired, I wanted to be ready to really get back into the coal business in an active way. And on each one of those loans, I thought they were a viable entity. I thought they were good loans, good advances. Sigmon also stated that he expected every one of the advances to be repaid. This Court, however, is not required to accept unquestionably petitioner's self-serving testimony. Tokarski v. Commissioner,87 T.C. 74, 77 (1986). The objective evidence shows that Sigmon did not seriously expect repayment other than out of possible future profits from operations or a sale of the companies. Although *473 repayments were made on these advances and the advances were treated consistently on Associates' and Superior River's books and records as loans -- indications of bona fide debts -- these factors are outweighed by the other factors which point in the direction of capital contributions. The circumstances suggest that these advances were placed at the risk of the business and, consequently, are to be treated as capital contributions. Our conclusion that these advances were in the nature of contributions to capital is bolstered by the following exchange between petitioners' counsel and Maxwell Barrett: [Bart A. Brown, Jr.] Q. Max, a final question. As you all planned the Superior River groups of companies and the Blue Grass groups of companies, was it anticipated that Harold would lend the tremendous sums to these companies that he ended up lending? [Maxwell Barrett] A. No, it really wasn't. Q. What happened? A. Well, those things I spoke about earlier in the market, and the costs that were incurred in the changes in the strip mine legislation and the Mine Safety and Health Act. It just imposed higher costs in a declining a market [sic] through that period *474 of time. Q. And the deeper you got in, the more you chased it? A. Well, you had to, Bart. It was either that or walk away; and even if you walked away, you couldn't -- it wasn't just a matter of just what you had with all these guarantees out there outstanding; with reclamation bonds. I have no idea now, but millions of dollars of reclamation obligations that were bonded and that we had indemnity agreements on. It was a matter of -- you could try to mitigate losses to a degree and hold on. I mean, you were still -- even through all this time with the market going the way it was and the operating difficulties, you still had people out buying coal companies, and serious buyers that were -- and these companies had their right elements. It was just a -- it just didn't work. And then, as you got into some operating disarray there at the end, and that possibility ceased to exist. This exchange supports our belief that Sigmon advanced the funds to protect his original capital investment in Superior River and at the risk of the success of that business. See Wachovia Bank & Trust Co. v. United States,288 F.2d at 756. Accordingly, we find that these advances *475 were contributions to capital, not bona fide debts.
Indebtedness due Sigmon from Superior River as a result of Sigmon's satisfaction of Superior River's obligation to First National Bank of Louisville
This item, in the amount of $ 1,107,312.10, represents the amount of Sigmon's personal assets which were applied, pursuant to Sigmon's guarantee, against indebtedness Superior River owed on its inventory and receivables line of credit with First National. For the reasons set forth above and below, we agree with respondent that this amount also represented a contribution to capital. Although the record is not clear on this point, it appears likely that Sigmon was the only Superior River shareholder who had sufficient personal wealth to guarantee the First National inventory and receivables line of credit. Moreover, the record clearly establishes that Sigmon was in complete control of Superior River and was to be its financier. Therefore, we believe that it is of no consequence that the remaining shareholders were not required also to guarantee this indebtedness. As stated above, Sigmon had complete control over all phases of Superior River's operations. Sigmon received *476 no consideration from Superior River for extending the guarantee, nor did he receive any security as protection when he exposed himself to the liability. It appears that, although mining is a very risky business, Sigmon made no substantial effort to restrict his exposure on the guarantee or to eliminate it altogether at some future time. See Kavich v. United States,507 F.Supp. 1339 (D. Nebraska 1981). Sigmon's guarantee simply amounted to a covert way of putting his money "at the risk of the business," i.e., the guarantee enabled Sigmon to create borrowing power for the corporation which normally would have existed only through the presence of more adequate capitalization of Sigmon's integrated coal business. See Plantation Patterns, Inc. v. Commissioner,462 F.2d 712, 722 (5th Cir. 1972), affg. a Memorandum Opinion of this Court. Based on these circumstances, we find that, as a matter of economic reality, Sigmon's payment [30] on his guarantee was a contribution to capital. *477 Open account indebtedness due Associates from Blue Grass
This item, in the amount of $ 447,199.08, represents the balances outstanding ($ 407,999.08 shown in account 121 and $ 39,200 shown in account 131) on advances Sigmon made at various times to Blue Grass. For the reasons stated above and below, we agree with respondent that these advances represent contributions to Blue Grass' capital. Sigmon also was in complete control of Blue Grass. These advances were unsecured, were not evidenced by written instruments, had no fixed maturity date, or any provision for repayment of principal or interest. No interest was paid on these advances. No repayments were made on account number 131. Repayments made on account number 121 were in varying amounts, at irregular intervals, and were insignificant in amount in comparison to the amount of the advances. [31] The advances in essence were subordinated to debts owed to Blue Grass' secured creditors. There is no evidence that when made Blue Grass had the financial capacity to repay any of the advances. We believe that when the advances were made the only hope for repayment was the possible future profitability of Blue Grass *478 or the sale of the company. The gamble of possible future earnings sufficient to pay the debt or the possible sale of the company does not warrant finding the advance to be debt. See Funk v. Commissioner,35 T.C. 42, 50 (1960). The parties have stipulated that Blue Grass recorded the advances as payables to Associates and Associates recorded the advances as accounts or notes receivable from Blue Grass. This factor is indicative of a loan. We believe, however, that this factor is inconsequential in light of the other factors which support *479 our finding that the advances were loans. Petitioners presented testimony that Sigmon had not intended to operate the Blue Grass Group over a long period of time, but intended merely to build an operating company or companies for resale. While we are not persuaded as to the veracity of this testimony, assuming arguendo that Sigmon did want to profit from a quick sale of the Blue Grass Group as soon as an appropriate purchaser could be found, this objective is not inconsistent with an investment motive in advancing these funds to Blue Grass. [32]
Petitioner presented no evidence to establish whether Blue Grass could have borrowed the money from a disinterested party; we believe, however, that outside loans were unavailable. At the time that the advances apparently were made, Blue Grass showed losses from operations and had a deficit in its retained earnings. Furthermore, the coal business was very risky. Moreover, although the debt-to-equity ratio of Blue Grass itself does not appear unusually high, Blue Grass was part of an integrated group of companies which, in the aggregate, was thinly capitalized, *480 see supra.
The record does not show how the funds were used; however, it appears likely that the funds were utilized either to complete construction of the coal tipple or to meet expenses needed to commence operations. This is indicative of a contribution to capital. See United States v. Henderson, supra.
We have considered petitioner's other arguments and find them to be unpersuasive. From this record, we are persuaded that these advances were placed at the risk of the business;consequently, we find that they also are to be treated as capital contributions. Although some factors support petitioner's contention that the advances and payment on his guarantee in issue were true debts, the weight of the evidence on the whole indicates that in fact they were contribution to capital. Petitioner simply has failed to sustain his burden of proof in this case. Therefore, we find that all of the items put in issue, in actuality, were contributions to the capital of the appropriate company. Since we conclude that all of the advances and the guarantee put in issue were contributions to capital and not bona fide debts, it is not necessary for us to decide whether *481 petitioner was engaged in the business of promoting, financing, and making loans to corporations or whether the advances or payment on the guarantee were business or nonbusiness bad debts. [33]
*482 To reflect the foregoing, Decision will be entered under Rule 155.
Footnotes
1. Petitioner Molly S. Sigmon, other than being named as a payee with Harold A. Sigmon (hereinafter referred to as "Sigmon" or "petitioner") on a "Secured Promissory Note" executed by Superior River Coal Company, Inc. and Elmon Corporation in the amount of $ 600,000 and a Mortgage Deed and Security Agreement relating thereto, see infra,↩ and was not a party to the transactions involved in this case and is a petitioner in this action solely by reason of filing joint Federal income tax returns with Sigmon for each of the taxable years involved. 2. The parties entered into a stipulation of partial settlement settling all but one of the issues involved in this case. As a result, a computation under Rule 155 is necessary. Such a computation can be made, however, only after a final decision is rendered in a related consolidated case as to issues involving the Wolfe County Coal Corporation, see n.12 infra.↩ Petitioners have agreed to be bound by the results of that case. 3. Although the 1979 tax year itself is not directly involved in this case, petitioners have claimed net operating loss deductions for some of the years in issue as a carryback from petitioners' 1979 year. Resolution of the issue of the amount of any allowable net operating loss deduction depends upon the Court's determination of the issues enumerated above. ↩
4. All other items on the 1979 return or 1979 amended return have not been put in issue and, consequently, are not before the Court and will not be considered by the Court. See Markwardt v. Commissioner,64 T.C. 989, 997↩ (1975); Rule 34(b)(4). 5. The dates and amounts received pertaining to this sale are as follows: ↩
Date
Principal
Interest
Total
7/26/74
$ 1,000,000
-0-  $ 1,000,000
8/26/74
1,814,975
-0-  1,814,975
1/02/75
440,513
$  15,663
456,176
6/01/75
1,214,740
167,364
1,382,104
6/01/76
1,214,740
97,179
1,311,919
Total
$ 5,684,968
$ 280,206
$ 5,965,174
6. We note that this testimony is inconsistent with the parties' stipulation that the money Franks and Collins invested in Superior River came from their share of a distribution from Wolfe County Coal Corporation, see infra.↩
7. The parties introduced as a joint exhibit Associates' general ledger. The parties also introduced a joint exhibit identified as Associates' "cash receipts and disbursements and general journal." This exhibit contained entries for 1978 and 1979 identified as cash receipts or cash disbursements; however, as far as we could determine, general journal entries were not included in this exhibit nor could we locate a general journal for Associates elsewhere in the record. The general ledger made folio references to "JE" in support of entries in the general ledger. The journal entries, however, were not located in the record. ↩
8. For the 1975 year the Schedule E is a combined Schedule E and R (Supplemental Income Schedule and Retirement Income Credit Computation). The subject items were reported on the Schedule E portion. ↩
9. Losses in the aggregate for partnerships ($ 8,115) and small business corporations ($ 392,113) were shown for 1978; however the referenced supporting schedules were not included with the copy of the 1978 Federal tax return filed with the Court. Therefore, although we surmise that income or losses from all or some of the corporations enumerated herein also was included on Schedule E for 1978, the record does not show this conclusively. ↩
10. Interest income from Elmon also was reported on Schedule B for 1978. ↩
11. Dividend income from Wolfe Corporation also was reported on Schedule B for 1976 and 1978. ↩
12. Certain matters pertaining to Wolfe Corporation recently were decided by this Court in the consolidated case Franks v. Commissioner,T.C. Memo. 1988-245. On the common issues involved in that case and this case, petitioners have agreed to be bound by the outcome of the Franks↩ case. 13. The balance sheet filed with Superior River's corporate income tax return for the fiscal year ending July 31, 1978, reflects a cost for buildings and other fixed depreciable assets of $ 1,338,269. ↩
14. However, Sigmon reported $ 10,799 in interest income from Elmon on Schedule B of his 1978 tax return. It is not clear from this record whether this amount was related to the $ 600,000 advance. ↩
15. All section references are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue unless otherwise indicated. All rule references are to the Tax Court Rules of Practice and Procedure unless otherwise provided. ↩
16. The stipulation of facts states that the $ 1,107,312.10 was owed to Associates in one place and owed to Sigmon in another place. The record supports a finding that the $ 1,107,312.10 was owed to Sigmon, not to Associates. We may disregard stipulations between parties if the evidence is contrary to the stipulation is substantial or the stipulation is clearly contrary to facts disclosed by the record. Loftin and Woodard, Inc. v. United States,577 F.2d 1206, 1232 (5th Cir. 1978); Jasionowski v. Commissioner,66 T.C. 312, 317-318↩ (1976). 17. Superior River, Blue Grass, S.C.E., Mary Beth, C&S Fuels, and Sigmon-Elkhorn filed Forms 1120 while Elmon filed forms 1120S. ↩
18. Intercompany receivables and payables pertained to various Sigmon entities not limited to the enumerated companies. ↩
19. Since 1978 and 1979 show a negative owners' equity, a meaningful debt-to-equity ratio cannot be computed for those years. Assets for 1978, according to these balance sheet figures, were underfunded by 22 percent (negative owners' equity divided by total assets). The debt-to-equity ratios for 1976 and 1977 may not be accurate since the companies had different ending dates for their fiscal years. However, the record does not contain sufficient information for us to calculate a true debt-to-equity ratio on the basis of the information in this record. Petitioner has the burden of proof and, therefore, must suffer the consequences of an inadequate record. See Samis v. Commissioner,76 T.C. 609, 617↩ (1981). 20. See also LaStaiti v. Commissioner,T.C. Memo. 1980-547↩. 21. See Roth Steel Tube Co. v. Commissioner,T.C. Memo. 1985-58, affd. 800 F.2d 625 (6th Cir. 1986), cert. denied 481 U.S.     (1987)↩. 22. See Lackey v. Commissioner,T.C. Memo. 1977-213↩. 23. We note, however, that the advance was proportional to Sigmon's interest in Wolfe Corporation. Collins and Franks, the remaining shareholders of Wolfe Corporation and the two other shareholders of Superior River who advanced it funds at this same time, also made their advances in proportion to their interests in Wolfe Corporation, suggesting at least some plan of proportionality for this advance to Superior River. ↩
24. In fact, the balance sheet filed with Superior River's corporate income tax return for its fiscal year ending July 31, 1977 (the period in which the advance was made) shows a ratio of debt-to-equity as of July 31, 1977, of 2.6 to 1. ↩
25. For this purpose, we consider the Elmon Group, the Blue Grass Group, and Sigmon-Elkhorn to be part of one integrated business. It could be argued that other Sigmon companies such as Al Mining, Quality Sales, and Quality Processing also should be added to the list. However, for the sake of simplicity, only the former companies are included here. We believe that excluding Al Mining, Quality Sales, and Quality Processing favors petitioner; therefore, no harm results from excluding the latter companies in our analysis. ↩
26. Although we are not persuaded that the positive taxable income before net operating deductions and special deductions reflected on Superior River's tax return for the period ending July 31, 1978 (filed sometime after April 24, 1979) is indicative of anything other than "creative accounting," possibly to make a failing business look more attractive to a would-be buyer, whether Superior River did in fact have the taxable income reported is not material to the outcome of this case. ↩
27. The journal entries for Associates pertaining to these advances are not part of the record. Superior River's books and records were not made a part of the record. ↩
28. The record is silent as to whether the shareholders of Superior River, Elmon, Mary Beth, or C&S Fuels subsequently elected to place those companies in bankruptcy. Apparently, only Elmon filed tax returns for tax periods ending in 1979 and later. ↩
29. The use of the word "loan" should not be construed as carrying any conclusion as to the legal effect of the documents or transactions involved here.↩
30. We recognize that Sigmon in fact did not make a payment on the guarantee. Instead, personal assets were sold to satisfy the obligations arising from the guarantee. However, this is a difference without a distinction. ↩
31. The record does not show the exact dates on which the advances were made. The advance recorded in Account 131 apparently was posted to Associates' general ledger on December 31, 1977. No other entries were made to this account. Account 121 in Associates' general ledger does not show the year in which the first advance was posted; presumably, it was sometime in 1976 since the next entry shows an April 1977 date. Two additional, minimal advances were made in 1977 and 1978 according to the ledger entries, with minimal repayments made in 1978 and 1979. Blue Grass' books and records were not introduced into the record. ↩
32. See Thaler v. Commissioner,T. C. Memo. 1978-24↩. 33. Petitioner raised the issue of whether he was engaged in the business of promoting, financing, and making loans to corporations only in connection with his argument that the loans were business, as opposed to nonbusiness, bad debts deductible under section 166. He has not raised the issue of whether any loss incurred by him on his Superior River and Blue Grass stock in 1979 would be deductible under section 165(a) as an ordinary loss incurred in his trade or business. If petitioner were in the business of promoting, etc., corporations, it might be argued that such a loss would be ordinary since the "stock" would be excluded under section 1221(1) (which excludes from the term "capital assets" "stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business") and, therefore, would not be governed by section 165(g). We have held on numerous occasions that we will not consider issues which have not been pleaded. Markwardt v. Commissioner,64 T.C. 989, 997 (1975), and cases cited therein. Had petitioner raised this alternate argument, however, on this record we would have found that he was not engaged in the business of promoting, financing, or making loans to corporations. See Whipple v. Commissioner,373 U.S. 193, 203 (1963); Syer v. United States,380 F.2d 1009 (4th Cir. 1967); Deely v. Commissioner,73 T.C. 1081, 1093 (1980); Millsap v. Commissioner,46 T.C. 751, 756 (1966), affd. 387 F.2d 420 (8th Cir. 1968). See also Hunter v. Commissioner,T.C. Memo. 1982-381↩.